(No. 86975.

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. FEDELL CAFFEY, Appellant.

*Opinion filed October 18, 2001.—Rehearing denied February 4, 2002.*

HARRISON, C.J., and KILBRIDE, J., dissenting.

Michael J. Pelletier, Deputy Defender, and Patricia

Mysza, Assistant Appellate Defender, of the Office of the State Appellate Defender, of Chicago, for appellant.

James E. Ryan, Attorney General, of Springfield (Joel D. Bertocchi, Solicitor General, and William L. Browers and Jay Paul Hoffmann, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE FREEMAN delivered the opinion of the court:

On November 16, 1995, Debra Evans was fatally shot and stabbed in the Addison apartment where she lived with James Edwards and her children, Samantha, Joshua, and Jordan. Debra was nine months pregnant. The baby she was carrying, Elijah, was cut from her womb. Samantha was killed in the apartment with her mother. Joshua and Elijah were taken from the apartment. Jordan was left alone in the apartment with his dead mother and sister. The next day, police found Joshua's dead body in an alley in Maywood. Police arrested defendant, Fedell Caffey, that night. In connection with the murders and kidnappings of the members of the Evans family, defendant, his live-in girlfriend Jacqueline Annette Williams, and her cousin Laverne Ward were jointly indicted on several counts of first degree murder and aggravated kidnapping. They were tried separately.

Following a jury trial in the circuit court of Du Page County, defendant was convicted of the first degree murder of Debra Evans and her daughter Samantha, and the aggravated kidnapping and murder of Debra's son Joshua. See 720 ILCS 5/9—1(a), 10—2(a) (West 1994). At a separate sentencing hearing, the same jury found defendant eligible for the death penalty and further determined that there were no mitigating circumstances sufficient to preclude imposition of that sentence. Accordingly, the trial court sentenced defendant to death on the murder convictions and to a consecutive 30-year

prison term on the aggravated kidnapping conviction. The death sentence has been stayed pending direct review by this court. Ill. Const. 1970, art. VI, § 4(b); 134 Ill. 2d Rs. 603, 609(a). We affirm.

## BACKGROUND

The State's evidence at trial was essentially as follows. On November 16, 1995, Debra Evans was nine months pregnant with her baby, whom she had named Elijah. Debra was scheduled to be hospitalized to have labor induced on November 19. Debra had three additional children: Samantha, age 10; Joshua, age 7; and Jordan, age 2. Debra and her children lived in an apartment in Addison with James Edwards.

Edwards worked across the street from his and Debra's apartment. On November 16, 1995, at around 5:30 p.m., he left the apartment and went to work. He returned home after leaving his job at 2:30 a.m. on November 17. The back door to the apartment was unlocked. When Edwards opened the door, Jordan greeted him. Edwards found Debra lying on the living room floor completely covered by a blanket. Edwards lifted the blanket and saw a large wound to her stomach. Elijah had been cut from Debra's womb. Edwards ran to the children's bedroom. He found Samantha lying on the floor completely covered by a blanket. He lifted the blanket and saw that Samantha's neck had been slashed. Joshua was missing. Edwards telephoned 911. Several items were missing from the apartment, including Edwards' Grambling State University Tigers starter jacket and a pair of poultry shears.

Also on November 17, between midnight and 1 a.m., Williams went to the apartment of Patrice Scott in Villa Park. Scott lived with Dwight Pruitt and her three daughters; her youngest daughter, Alexis, was only 1½ months old. Williams and Scott were friends; they had known each other for two to three years. Approximately

one month prior to that night, Williams had told Scott that she was pregnant and that Williams was going to have the baby in November.

Williams' knock at the door awoke Pruitt. He arose, went to the door, and saw Williams and a boy. Pruitt returned to bed and told Scott, who answered the door. Scott saw a gray automobile parked outside. Williams was wearing Edwards' starter jacket and a white sweater spotted with blood. Joshua was wearing a T-shirt, coat, and boots; he was not wearing socks or pants.

Williams told Scott that Joshua's mother had been shot, and that Williams was going to visit her in the hospital. Williams asked Scott if Joshua could spend the night at Scott's apartment; Scott assented. Williams would retrieve Joshua in the morning. Williams also claimed to have given birth and would bring the new baby with her.

After Williams left, Joshua used the bathroom and removed his coat and boots. Scott put him to bed on the living room couch. She heard Joshua whimpering and crying during the night.

Later that morning, at daybreak, Scott heard Joshua crying. Scott arose with Alexis and entered the living room. Joshua was upset. He told Scott that he had to return to his home because Jordan was there alone, and because Edwards would not know where he, Joshua, was.

Joshua explained that four burglars had entered his home through a window and cut his mother and sister. Scott asked Joshua who were the burglars, and Joshua answered "Annette, Levern [sic] and Fedell," and a person Joshua called "Boo-Boo." Joshua repeated this more than three times. He explained that he was hiding and, as the burglars were leaving, he ran outside and bumped into Williams.

Pruitt was awake in the bedroom watching television with the volume lowered. He overheard Joshua name the

four burglars: "Annette"; "Vern"; a name that sounded like "Vedelle," "Adelle," or "Ladelle"; and a fourth name that Pruitt could not understand. At that point, Pruitt entered the living room, greeted Joshua, and returned to the bedroom. Scott's two older daughters arose and prepared for school. They greeted Joshua; one of them read to him. After they left for school, Joshua told Scott "to lock the door because the burglars might come back."

Around 9 a.m., Williams returned to Scott's apartment. Williams drove the same gray automobile that Scott saw the previous night. Scott told Williams what Joshua had said. Williams became very upset with Joshua. She accused him of lying, she told him that "he talked too much," and she ordered him "to shut his damn mouth." In response, Joshua repeatedly asserted that he was telling the truth, and that Williams knew he was telling the truth because she was there.

Williams told Joshua that he had to take the medicine his mother had left for him. Joshua replied that he did not take any medicine. Williams asked Scott for a glass of water, which Scott retrieved from the kitchen. Williams took the water and led Joshua into the kitchen. Joshua came out of the kitchen gagging, went to the bathroom and vomited.

Williams said she had gifts for Alexis and wanted to check on her own baby. Scott asked Pruitt to watch Alexis, but he refused. So Scott left the apartment with Alexis, Williams, and Joshua.

Home alone, Pruitt continued to watch television. On the midday news, he saw a report regarding the murders. The report included a photograph of Debra and her children. Pruitt recognized Joshua in the photograph. Pruitt dressed, left the apartment, and looked for a telephone. He could not find one that worked and eventually returned home.

Williams first drove to a nearby store and then to the

Schaumburg town house that she shared with defendant. It was a three-level residence: garage and laundry room on the bottom floor, living room and kitchen on the middle floor, and bedrooms on the top floor. Williams drove into the garage. They left the car and went up to Williams' living room. Williams invited Scott "to look around," since it was her first time in Williams' home. Joshua stayed with Alexis in the living room. On being called by Williams, Scott went upstairs and into a bedroom. Defendant was lying on a bed with a "really pale" baby, who had "streams of blond hair coming down from his cap" and "tape across his navel."

Scott returned to the living room, where she gave Alexis a bottle of milk. Later, Scott heard Williams' voice instructing her to bring Joshua downstairs to the laundry room.

Scott did so. In the room, Scott saw defendant, Williams, and an unidentified man who soon thereafter departed. Scott denied that this man was Bo Wilson. Joshua was directed to sit on a daybed. Defendant asked Williams why she had brought Scott to the house and why she had not taken Joshua to "the projects" as defendant had instructed her. Williams answered that Joshua "talked too much" and that he knew their names: he knew defendant, Williams, and Ward.

Williams picked up a white cord. Joshua was ordered to lean forward. Defendant and Williams, each pulling on an end of the cord, began to strangle Joshua. He screamed and clutched at the cord. Scott screamed and pushed Williams, who released her end.

As Joshua was crying and rubbing his neck, Williams left the laundry room, returned with a knife, and placed it on the bed. Scott screamed and asked Williams to take her and Joshua to Scott's home. Williams directed Scott to retrieve Alexis. Scott took Joshua and went upstairs. She tried to leave through the front door, but it was locked.

Scott, with Alexis and Joshua, returned downstairs. Defendant warned Scott not to say anything, or else, according to Scott, he would "get me and my daughters." Defendant directed Williams to take Scott home. They all went to the garage and got in the car. Scott sat in the front passenger seat with Alexis. Joshua sat in the backseat on the passenger side. Defendant entered the car on the rear driver side. Scott looked in the back of the car and saw defendant repeatedly stab Joshua. Williams stood along the driver's side of the car and appeared to be reaching inside the car and holding Joshua. He was gasping and kicking the front seat.

Williams sat in the driver's seat, and defendant told her that "she knew where to go." They drove to Maywood, where defendant and Williams took Joshua from the car and helped him walk to the rear of a building. Defendant and Williams returned without Joshua. Williams left defendant in Maywood and drove Scott to her apartment.

At approximately 12:15 p.m., Williams and Scott returned to Scott's apartment. At Williams' request, Scott gave her cleaning supplies for her car. Scott denied helping Williams clean the car. Greeting Scott, Pruitt told her to lock the door, and that he would telephone police. When Pruitt left, he saw Williams cleaning her car. Eventually, Williams drove away.

Pruitt found a telephone and contacted Addison police. Several police departments joined in the investigation. A police car picked Pruitt up and returned him to his apartment. Scott and Pruitt subsequently left the apartment with police. Scott led police to the building where defendant and Williams had dumped Joshua. Police recovered Joshua's corpse. Scott admitted that she did not initially tell police that Joshua had named defendant and "Boo-Boo" as two of the burglars. She explained that she feared defendant.

At 10:45 p.m., police went to defendant's and Williams' town house. They were not at home, but Williams' children and their friends were there, with her oldest daughter, age 11 or 12, baby-sitting. At 11:45 p.m., defendant and Williams returned home. Police arrested them as they entered the dwelling. Williams was carrying Elijah, who had a bloody piece of gauze taped over his navel. Defendant was wearing Edwards' starter jacket, the right cuff of which was stained with Elijah's blood.

Police recovered the following evidence. In Debra's apartment, in the living room, a vehicle emissions test notice addressed to Debra had a bloody fingerprint. The State's expert opined that it was Williams' fingerprint. The bathroom vanity had blood on it; the blood was subsequently determined to be Elijah's. The missing poultry shears were found on the sidewalk in front of the apartment. There was blood on the shears, and one of its handles was broken. DNA tests revealed that the blood belonged to Samantha.

Police also recovered evidence from Scott's apartment. Investigators found an empty iodine bottle in the kitchen garbage.

In a garbage bag in the garage of defendant's and Williams' townhouse, police found a white coaxial cable with blood on it. DNA tests revealed that the blood belonged to Joshua. Scott identified the cable as the one defendant and Williams used to strangle Joshua. In the dishwasher, police found a "rusty wooden handled butcher knife," which Scott identified as the knife that defendant used to stab Joshua. On the backseat carpet of defendant's and Williams' car, police found blood that had been treated with cleaner. DNA tests revealed that the blood belonged to Joshua. In a bedroom closet, police found a bottle of baby lotion with a stain on it. DNA tests revealed that the stain was a mixture of the body

fluids from Joshua and Elijah. On the kitchen counter, police found two counterfeit birth certificates indicating, *inter alia*, that a baby was born to Williams and defendant at a hospital on November 16, 1995. The documents had been typed on Vikki Iacullo's typewriter.

Also, on November 18, police found a bedsheet, stained with Joshua's blood, seven blocks from where his body was found. A matching sheet and pillowcase were found in defendant's and Williams' town house. On December 2, Iacullo and Dorothy Hale directed police to Herrick Lake in Wheaton, where they found a .25-caliber pistol. Police determined that the gun had fired the bullet that was recovered from Debra's head.

The State presented the following forensic evidence. Dr. Shaku Teas performed autopsies on Debra and Samantha. The cause of Samantha's death was multiple stab wounds. Samantha had seven stab and incised wounds to the neck. Dr. Teas explained that a stab wound is deeper than it is long, and an incised wound is longer than it is deep. Samantha also had several incised wounds to the left arm, which Dr. Teas opined were defense wounds.

Dr. Teas determined that Debra was shot in the back of the head. The bullet traveled though the right side of the brain to the area behind the forehead. This was the main cause of death. Debra also had four incised wounds to the neck. These wounds contributed to her death. Also, there was a 13-inch, jagged, horizontal wound across the lower abdomen. The umbilical cord was protruding therefrom. This deep wound penetrated the abdominal cavity and the small bowel. The uterus had been sliced open. Dr. Teas opined that all of the stab and incised wounds to Samantha and Debra, including the wound to Debra's abdomen, could have been caused by the poultry shears found in front of Debra's apartment.

Dr. Christopher Olson was Debra's obstetrician-

gynecologist. The blood spatters around Debra's body suggested to Dr. Olson the presence of blood pressure. He opined that Debra's heart was still beating when Elijah was cut out of her womb.

Also, Dr. Olson explained that three persons are required to perform a Caesarean in an appropriate medical manner. At a minimum, more than two hands are needed. Dr. Olson opined that Elijah's removal from Debra's womb required more than one person.

Dr. Joseph Cogan performed an autopsy on Joshua. His neck had ligature marks, which indicated strangulation. The marks were caused by a cord wrapped around his neck at least twice. Joshua's neck had several stab wounds, and he had no defensive wounds. Also, aspiration had occurred, *i.e.*, Joshua had inhaled his own vomit. Dr. Cogan opined that Joshua was first strangled and then stabbed, and the aspiration occurred after he was stabbed.

The ligature marks were consistent with the white coaxial cable found in defendant's and Williams' garage. The stab wounds were consistent with the butcher knife found in their dishwasher. The unusual damage to Joshua's lung tissue from the aspirated stomach contents was consistent with the ingestion of iodine. Joshua died from multiple injuries: the strangulation, the stab wounds, and the aspiration of the stomach contents. Joshua would not have died immediately from his injuries, but he would not have lived for more than 30 minutes.

The above evidence describes the circumstances of the murders and kidnappings of members of the Evans family. In addition, the State presented evidence concerning defendant, Williams, and Ward in the months preceding the crimes, and evidence of their relationships with the Evans family.

Debra and Edwards had been in a relationship since

1989. Debra's sister described it as "on again off again." They had separated several times. In March 1995, Debra and Edwards reconciled, and he moved back in their apartment.

While Debra and Edwards had been separated, Laverne Ward lived with Debra. When Debra and Ward lived together in 1993, he beat her more than once. Ward was the biological father of Jordan. Debra told her sister that Edwards fathered Elijah, which Edwards believed to be the case. However, subsequent DNA tests revealed that Ward was the biological father of Elijah.

Dawn Killeen was a neighbor of defendant and Williams. Killeen was well acquainted with defendant, Williams, and Ward. Killeen's husband and defendant sold drugs together. Killeen and Ward were crack cocaine addicts and took drugs together. Also, Ward was a courier for defendant.

In May 1995, Killeen went to the apartment of defendant and Williams to borrow a vacuum cleaner. Among those in the apartment was Vikki Iacullo. Ward entered the apartment screaming that Debra was not allowing him to see Jordan. According to Killeen, Ward "said that he was tired of her shit and he wanted to end it. He wanted to solve the problem. He wanted to kill the bitch." Defendant asked if Ward wanted a knife or a gun. Williams advised Ward to calm down because he would be the most likely suspect. In September 1995, Williams told Killeen that she was pregnant.

During the last few weeks prior to the murders, Ward telephoned Debra several times. During these conversations, Edwards overheard Debra arguing with Ward.

Approximately one week prior to the murders, Williams went to Debra's apartment and asked for her. Williams and Edwards spoke briefly. She asked Edwards about his work schedule. Edwards told Williams that he went to work at about 6 p.m. and returned home at about 2:30 a.m.

On the afternoon of November 16, 1995, John Pettaway, Williams' cousin, saw defendant, Williams, and Ward together. As Pettaway and Ward were driving around Wheaton, Ward saw defendant and asked Pettaway to stop. Defendant and Williams were in an automobile parked in a lot. Ward left Pettaway's car and spoke to defendant and Williams for approximately 10 to 15 minutes. Ward returned to Pettaway's car and they left. Pettaway and Ward went to the home of Pettaway's brother. Ward told Pettaway that he had to find defendant. When they left the house, they encountered defendant and Williams driving down a street. Defendant and Williams pulled to one side. Ward again left Pettaway's car and spoke with defendant and Williams for approximately 20 minutes. Defendant and Williams then drove away. Later that afternoon, Ward again told Pettaway that he had to meet defendant. Pettaway drove to the school where, unbeknownst to him, Williams' children attended. They did not find defendant.

Tina Martin, Williams' sister, shared a house with their mother in Wheaton. In April 1995, Williams told Martin that Williams was pregnant. On November 16, at around 6:50 p.m., Ward went to Martin's house. There, Ward had a telephone conversation with Debra. Martin overheard a portion of the conversation, during which Ward asked Debra: "Is it his or is it mine?" Ward left Martin's home at around 8:10 p.m.

Kasandra Turner had met defendant and Williams in April 1995; Williams then told Turner that Williams was pregnant. On November 16, between 5:30 and 6 p.m., defendant telephoned Turner. Defendant told Turner that he and Williams were going to have the baby.

On November 16, between 8:30 and 9:30 p.m., Jacci Sullivan, who lived in Debra's apartment complex, heard a gunshot. At about 9:15 p.m., Tennie Clay, who also lived in the complex, saw four persons standing on a

sidewalk talking to each other. She believed that three of them were African-American and one was a light-skinned Hispanic. One of them was wearing a dark-colored starter jacket, and the others were wearing black, hooded sweatshirts or jackets.

That evening, Joy Wilson, age 15, and Tiffany Wilson, age 16, were baby-sitting at Tiffany's house. Tiffany was Joy's aunt and also a cousin of Ward and Williams. Tiffany and Joy were watching the 9 p.m. news when Ward entered the house. He was carrying a plastic grocery bag that contained something. Ward went directly to a bathroom.

According to Tiffany, Ward emerged from the bathroom wearing different pants and still carrying the grocery bag. He and Joy left the apartment. Ward later returned to Tiffany's home without the bag.

Joy saw more. According to Joy, when Ward entered the house, his pants had a hole in the knee, and his pants and T-shirt had bloodstains. When Ward emerged from the bathroom, he was wearing different clothes, and the grocery bag appeared fuller.

The family dog then frightened Joy and caused her to run outside. She saw a four-door gray automobile with three persons inside—two men in the front seat and a woman in the back seat. Joy identified them all—two of them were Williams and defendant. They were sounding the car horn and calling for Ward. Carrying the bag, he got in the car, and they left.

Mohammid Siddiqui was a clerk at a Seven-Eleven store at Golf Road and Walnut Lane in Schaumburg. He saw defendant and a woman matching the description of Williams enter the store on November 17, 1995, between 1:30 and 2 a.m. Defendant bought baby wipes and candy. The store register tape records a sale at 1:49 a.m. for one item at $1.99, which was the price of baby wipes, and one item at $0.99 cents.

At approximately 3:30 a.m., Williams telephoned her sister, Tina Martin, and told her that she, Williams, had just given birth. Vikki Iacullo then spoke to Martin to confirm Williams' announcement. Martin then asked to speak with defendant. She asked defendant if a baby were really there, and defendant answered in the affirmative.

Martin and her mother then drove to Iacullo's house. There, Martin and her mother saw Iacullo, Williams, defendant, and a baby. Iacullo explained to Martin and her mother that Williams came to Iacullo's house and then went into labor. Iacullo said that she rushed Williams to a hospital, where she gave birth. Iacullo gave this explanation in defendant's presence. The baby's complexion was so light that Martin asked Iacullo, who was Caucasian, if the baby were hers. Martin's mother declared that she did not believe that the baby belonged to Williams and defendant, and then asked to leave. The visit of Martin and her mother lasted only approximately three to five minutes.

That afternoon, John Pettaway saw Williams and two of her children at a car wash. One of Williams' daughters was vacuuming the backseat area of her car.

Defendant, Williams, and Ward were jointly charged in a 24-count indictment: 21 counts of first degree murder, two counts of aggravated kidnapping, and one count of armed robbery. The three charged individuals were tried separately. See *People v. Williams*, 193 Ill. 2d 306, 314-15 (2000). In defendant's case, the State entered a *nolle prosequi* on 10 of the murder counts and the armed robbery count. At the close of the State's case, the trial court directed a verdict of not guilty on one of the remaining aggravated kidnapping counts. Defendant was ultimately tried for the intentional and knowing murder of Debra, Samantha, and Joshua (720 ILCS 5/9—1(a)(1), (a)(2) (West 1994)), their felony murder based on the

felonies of aggravated kidnapping and armed robbery (720 ILCS 5/9—1(a)(3) (West 1994)), and the aggravated kidnapping of Joshua (720 ILCS 5/10—2(a)(3) (West 1994)).

The defense case was essentially as follows. The theory of the defense was that Williams was possessive and jealous of defendant. Williams planned to cement her relationship with defendant by claiming to be pregnant. Williams, Ward, and Iacullo conspired to take Elijah. Those three committed the charged offenses. Defendant was not part of their conspiracy; rather, he was the purpose of it.

Defendant was born in 1973. In 1992, defendant quit his job at United Parcel Service to sell drugs. Defendant began dating Williams in the spring of 1994. She had three children. Unbeknownst to defendant and others, Williams had a tubal ligation in 1986 and could no longer have children.

Shortly after defendant and Williams began dating, Williams learned that defendant had a one-year-old daughter by his former girlfriend Latrina Montgomery. Defendant continued to have a sexual relationship with Montgomery and other women while he was living with Williams. Because she was jealous of Montgomery's relationship with defendant, Williams had physical and verbal altercations with Montgomery from 1994 through 1995.

In February 1995, Williams told defendant that she was pregnant. She had previously feigned pregnancies. In June 1995, defendant, Williams, and her children moved to their Schaumburg town house.

At around 7:15 p.m. on the evening of November 16, 1995, defendant, Williams, and her children returned home from a school basketball game. Williams left shortly thereafter.

Defendant admitted that he telephoned Kasandra

Turner earlier that evening. However, he denied announcing to her that he and Williams were going to have a baby. Defendant explained that Turner bought drugs from him the previous day and paid for them with a check. Defendant telephoned Turner to inform her that the check had bounced. After his arrest, police found the check in the glove box of defendant's car.

Between 6:30 and 7 p.m., Joyce Holtz went to defendant's home and bought cocaine from defendant. She stayed for approximately three minutes. Between 8 and 9 p.m., defendant watched a television program with Christina, one of Williams' daughters. When she went to bed, sometime between 8:05 and 9 p.m., defendant was still home.

At 1:30 a.m. on November 17, defendant was worried because Williams had not yet returned home. He went to the nearby Seven-Eleven store to use a pay phone. He denied buying baby wipes at that time. Defendant telephoned Tina Martin and asked her to page Williams. Defendant then telephoned Iacullo and returned home.

At approximately 2:30 a.m., Iacullo drove into defendant's driveway. Defendant went to Iacullo's car; Williams was inside holding a baby. Indoors, Iacullo told defendant that Williams was at Iacullo's house when she went into labor. Iacullo drove Williams to a hospital where she had the baby. Williams had to leave the hospital because she did not have health insurance.

Defendant was initially skeptical of Williams' and Iacullo's story. However, he began to believe it because a baby was there at 2:30 a.m. The three of them took the baby to Iacullo's house to retrieve Williams' car. At the house, Williams telephoned Tina Martin and, as described earlier, informed her of the baby.

Defendant and Williams left Iacullo and drove to the same Seven-Eleven store where defendant was earlier. He bought baby wipes at that time. The store register

tape records a 4:49 a.m. purchase of an item costing $1.99, which was the price of baby wipes. They returned home at around 5 a.m. Defendant lay next to the baby and fell asleep.

Defendant awoke at around noon, performed an errand with Williams and the baby, and returned home between 1:30 and 2 p.m. Williams then left to pick up her children from school. Defendant stayed home with the baby. Williams returned between 4:30 and 5 p.m.

At approximately 8:50 p.m., Iacullo paged defendant. He, Williams, and the baby went to Iacullo's house. Iacullo gave defendant a Grambling Tigers jacket, calling it a "Daddy's Day present." Defendant had left home without a coat because their car was sufficiently heated. They returned home, where they were arrested, with defendant wearing the jacket, and Williams carrying the baby.

Iacullo was charged with obstruction of justice regarding her involvement in these crimes. Invoking the fifth amendment, she refused to testify at defendant's trial.

The defense attacked the credibility of the State's witnesses and suggested inconsistencies and contradictions in their testimony. Defendant denied any involvement in these crimes.

At the close of the evidence, the jury returned general verdicts of guilty of the first degree murders of Debra, Samantha, and Joshua. The jury also returned a general verdict of guilty of the aggravated kidnapping of Joshua.

In the eligibility phase of the death sentencing hearing, the jury returned seven separate eligibility verdicts. The jury found beyond a reasonable doubt the presence of the following statutory aggravating factors. Regarding Debra's murder, the jury found that defendant was convicted of murdering two or more persons. See 720 ILCS 5/9—1(b)(3) (West 1994). Regarding Samantha's

murder, the jury found that: defendant was convicted of murdering two or more persons; and the murder of Samantha, who was under the age of 12, was brutal and heinous. See 720 ILCS 5/9—1(b)(3), (b)(7) (West 1994). Regarding Joshua's murder, the jury found that: defendant was convicted of murdering two or more persons; Joshua was killed in the course of another felony, either aggravated kidnapping or armed robbery; the murder of Joshua, who was under the age of 12, was brutal and heinous; and defendant murdered Joshua to prevent him from giving material assistance to the State. See 720 ILCS 5/9—1(b)(3), (b)(6), (b)(7), (b)(8) (West 1994).

At the second stage of the death sentencing hearing, the State's case in aggravation included the following evidence. In March 1991, a state trooper stopped defendant for speeding. A protective pat-down search of defendant revealed a box of ammunition. Defendant was arrested for unlawful possession of ammunition and traffic offenses. Defendant received court supervision.

In July 1991, police stopped defendant for speeding. He was driving with two passengers. Hidden under the left side of the front passenger seat was a loaded pistol with two freshly discharged cartridges.

In February 1992, Nakia Weaver, a high school girlfriend of defendant, witnessed defendant and another student fight in a classroom. After school that day, defendant found Weaver, who was sitting in the front passenger side of a car. Weaver rolled down the window. Blaming her for the fight, defendant slapped Weaver in the face. Weaver defended herself, and defendant punched her in the face and then left. Weaver reported the attack to police, and defendant was charged with battery. However, Weaver did not appear in court because she was not notified of defendant's court date.

In September 1994, defendant, standing in the middle of a residential street, fired multiple rounds from a

handgun. It was noontime on that particular day, and children were walking and playing on the street. One bullet shattered an automobile windshield. Defendant was apprehended and subsequently convicted of criminal damage to property, unlawful possession of a firearm, and unlawful use of a weapon. He was sentenced to one year of conditional discharge and 10 days of community service.

In December 1994, police encountered defendant and another man in a parked automobile. Defendant was sitting in the front passenger seat. A consensual search of the car revealed a loaded handgun under defendant's seat. A charge of unlawful use of a weapon was ultimately dismissed.

In January 1995, defendant struck Gregory Flowers in the head with a beer bottle, accusing him of stealing a part from defendant's automobile. Flowers received a three-inch laceration. He did not sign a criminal complaint, and defendant was not charged.

In July 1995, a police officer saw defendant chase a vehicle down a street. The officer then saw defendant return to and enter another car. The officer approached; defendant was sitting in the front passenger seat. The officer knew that there was a warrant for defendant's arrest for failure to appear in court. The officer ordered defendant out of the car. As defendant exited the car, the officer observed a small handgun, a pillowcase, and a digital scale on the floor in the area where defendant was seated. The gun was a BB gun, and the pillowcase contained $125.78 in coins. Defendant also had on his person $235 in currency. Defendant volunteered that the coins were his, but he denied knowledge of the BB gun, the scale, or the $235. He was charged on the warrant for failure to appear in court.

The State lastly presented victim impact evidence. Sam Evans, Debra's father; Wendy Williams, Debra's

sister; and Scott Gilbert, Samantha's father, each read a victim impact statement.

Defendant's case in mitigation included the following evidence. Sonia Glover, defendant's great aunt, testified as follows. In his childhood, defendant lived with his maternal grandfather, James Caffey; his grandmother, Winifred; his mother, Elaine; and his uncle David. Although they claimed to know the identity of defendant's father, that man never acknowledged defendant as his son.

Defendant grew up in a dysfunctional household. Winifred was a chronic schizophrenic and was regularly hospitalized at several institutions. At the time of the death sentencing hearing, she was in a permanent facility. Winifred attempted suicide several times both before and after defendant was born. In defendant's presence, she would see things and hear voices that were not there. Also, defendant's mother was mentally ill. She took LSD before and after she gave birth to defendant.

Defendant had a good relationship with his grandfather, who was defendant's male role model. In 1991, James Caffey died of cancer, in his home, with defendant there.

While in high school, defendant began a relationship with Latrina Montgomery. They had a daughter, Vanessa. Defendant's uncle David also had children. Defendant cared for these children and never lost his temper with them or struck them.

Glover's thoughts of defendant were "very positive" because "[h]e grew up through difficult times." Noting defendant's childhood home, Glover believed that defendant has "somewhat been a victim." Glover also noted that when defendant reached high school, he had joined a street gang. According to Glover: "This introduced him to a lifestyle of fast living, fast money, and absolute hell."

Defendant's uncle David amplified much of Glover's testimony. He added the following. He was raised as defendant's brother because he was only four years older than defendant. Both defendant's mother and grandmother were paranoid schizophrenics. They always argued, which caused defendant to become withdrawn and quiet. David never saw defendant lose his temper with his daughter or David's three children.

Defendant's grandfather treated defendant like a son. His grandfather's death deeply affected defendant and upset the entire household. David added that defendant became involved in a street gang and sold drugs. However, these activities were not connected.

Defendant's fourth grade teacher, Neacy White, testified that in her classroom defendant was quiet, helpful, respectful, and obedient. She believed that defendant knew the difference between right and wrong and, to her knowledge, defendant was not placed in learning disability or special education classes.

Defendant's cousins Gary Smart and Ronalda Robinson each testified regarding defendant's loving attitude toward his family. According to Smart, defendant never acted violently toward his family. Defendant always cared for his mother; he always gave her money as needed. When defendant became a teenager, he grew more independent from his extended family. Defendant "all of a sudden, he had things, and you'd wonder where he got them from."

According to Robinson, defendant was the same age as her two older sons. Defendant visited her home often and spent much time with them. He also played with her younger children. Defendant was very loving and caring toward his daughter Vanessa. Robinson never saw defendant react violently to these children; he never lost his patience with them or hit them. He also attended church services with Robinson, who was a church elder.

George Savarese, Ph.D., a licensed clinical social worker, prepared a "Psychosocial Developmental Evaluation" of defendant. In preparing this evaluation, Dr. Savarese interviewed defendant, his family members, neighbors, and teachers. He also reviewed various birth, medical, psychiatric, and school records. The purpose of the evaluation was to determine whether there were "developmental stressors" that occurred in defendant's life. Dr. Savarese described a "developmental stressor" as any event or circumstance that occurred in a person's life that is an obstacle to normal development. Dr. Savarese searched for possible stressors through all stages of defendant's life, including prior to his birth. Dr. Savarese then formed an opinion as to how those stressors impacted defendant's behavioral functioning, emotional coping, and cognitive ability.

In his testimony, Dr. Savarese referred extensively to his written evaluation. His testimony included all of the information supplied by the above-mentioned mitigation witnesses.

Dr. Savarese testified regarding defendant's childhood household. His testimony supplied additional information regarding defendant's mother, Elaine: her mental illness, her abuse of drugs and alcohol, and her resulting inability to care for defendant. Essentially, all she could do was sleep and abuse substances, if she were not hospitalized.

Dr. Savarese provided further details regarding defendant's grandmother, Winifred: her mental illness, her substance abuse, her repeated suicide attempts, her repeated physical fights with defendant's mother, and several examples of her bizarre behavior. For example, when defendant was a teenager, she would strip naked and walk into his room; defendant would have to dress her.

Dr. Savarese supplied additional information regard-

ing the men in defendant's household. Defendant's grandfather, James, provided defendant with a model of how to cope with this chaotic household. James would occasionally leave the household to live with a girlfriend. However, James would return to take Elaine or Winifred to a hospital as needed. Defendant's uncle David sold crack cocaine from their home.

Also, later in his life, defendant confronted the man family members claimed was his father. However, the man told defendant that he and several other men had group sex with his mother. Thus, Dr. Savarese testified, the man "disavowed he was his [defendant's] father and said no one was really clear on who his father was *** [a]nd no one would take credit for who was, in fact, his father."

Dr. Savarese formed several opinions regarding how defendant's childhood household affected him. Due to his chaotic and dysfunctional household, defendant had the sense of not being cared for and a fear of abandonment or rejection. The substance abuse in the household normalized that behavior for defendant and impacted his decision to sell drugs. Defendant began to sell drugs and escalated his exposure to street gangs because there was no one at home to limit that behavior.

Dr. Savarese testified regarding defendant's adult relationships. Defendant became involved with two women at the same time: Latrina Montgomery, the mother of his daughter Vanessa, and Williams. Dr. Savarese opined that defendant was in the same triangle between two women as he was between his mother and grandmother.

Williams was very manipulative, threatening, and violent. She used suicide attempts to control defendant's behavior. For example, when defendant once tried to leave her, she slit her wrists. Dr. Savarese gave additional examples of Williams' conduct. She stabbed defendant

and then stood vigil over him at a hospital. She crashed his car and then told police that defendant had crashed the car and had hit her. Williams told defendant that if he left her, her children would be on the street without a father. Defendant felt responsible for her children.

At the close of the sentencing hearing, the jury found that there were no mitigating circumstances sufficient to preclude imposition of the death penalty. The trial court entered judgment on the verdict.

After denying defendant's post-trial motion, the trial court held a sentencing hearing on defendant's aggravated kidnapping conviction. There, defendant made a statement in allocution. Defendant expressed sympathy for the Evans family. However, he claimed complete innocence; he denied any involvement in these crimes.

The trial court sentenced defendant to death on the first degree murder convictions. The court also sentenced defendant to a consecutive 30-year prison term on the aggravated kidnapping conviction.

Defendant appeals. Additional pertinent facts will be discussed in the context of the issues raised on appeal.

## DISCUSSION

### Guilt Phase

### I. Exclusion of Hearsay Statements

Defendant contends that the trial court erred in excluding out-of-court statements by (A) Ward, (B) Williams, and (C) Iacullo. Defendant contends that these statements would have supported his theory at trial that Williams deceived him into believing that she was pregnant, and that he did not participate in Ward's and Williams' plan to commit these crimes. "Hearsay evidence is an out-of-court statement offered to prove the truth of the matter asserted, and it is generally inadmissible due to its lack of reliability unless it falls within an exception to the hearsay rule." *People v. Olinger*, 176 Ill. 2d 326,

357 (1997). Defendant argues that these statements fell within various exceptions to the rule against hearsay.

The parties initially disagree as to our standard of review. The State contends that we should review deferentially the trial court's exclusion of this testimony. Defendant, however, contends that we should review *de novo* the trial court's exclusion of these hearsay statements. Evidentiary rulings are within the sound discretion of the trial court and will not be reversed unless the trial court has abused that discretion. *People v. Reid*, 179 Ill. 2d 297, 313 (1997); *People v. Ward*, 101 Ill. 2d 443, 455-56 (1984). An abuse of discretion will be found only where the trial court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court. *People v. Illgen*, 145 Ill. 2d 353, 364 (1991). Reviewing courts generally use an abuse-of-discretion standard to review evidentiary rulings rather than review them *de novo*. *People v. Childress*, 158 Ill. 2d 275, 296 (1994).

Defendant argues that the evidentiary rulings at issue here were uniquely legal rulings, which we may review *de novo*. It is true that reviewing courts sometimes review evidentiary rulings *de novo*. This exception to the general rule of deference applies in cases where "a trial court's exercise of discretion has been frustrated by an erroneous rule of law." *People v. Williams*, 188 Ill. 2d 365, 369 (1999); see, *e.g.*, *People v. Aguilar*, 265 Ill. App. 3d 105, 109 (1994).

We reject defendant's argument and review these evidentiary rulings with deference to the trial court. The decision whether to admit evidence cannot be made in isolation. The trial court must consider a number of circumstances that bear on that issue, including questions of reliability and prejudice. See *Childress*, 158 Ill. 2d at 295-96. In this case, the trial court exercised discretion in making these evidentiary rulings, *i.e.*, the court

based these rulings on the specific circumstances of this case and not on a broadly applicable rule. See *People v. Hall*, 195 Ill. 2d 1, 21 (2000); *People v. Williams*, 181 Ill. 2d 297, 313 (1998).

## A. *Ward's Excluded Hearsay Statement*

Pettaway testified that on the afternoon of November 16, 1995, he was with Ward, who told Pettaway that he had to find defendant. The State theorized that Ward, defendant, and Williams met to plan these crimes. On cross-examination, defendant's trial counsel asked Pettaway: "Did Mr. Ward ever indicate to you that he wanted to buy drugs from [defendant] on November 16th, 1995?" Over the State's objection, Pettaway answered: "Yes, he did." The trial court sustained the State's objection on hearsay grounds. The court would not allow defendant's trial counsel to elicit the remainder of Ward's hearsay statement—that Ward needed to find defendant to buy drugs from him.

The State initially responds that defendant waived review of this ruling because he failed both to object at trial and to include the issue in his post-trial motion. The record shows that, during a sidebar, defendant's trial counsel unsuccessfully asserted the hearsay exceptions on which he now relies. We will consider this issue even though defendant failed to include it in his post-trial motion because defendant raised the issue at trial and the issue concerns defendant's due process right to present a defense. See *People v. McCallister*, 193 Ill. 2d 63, 99-100 (2000), citing *People v. Enoch*, 122 Ill. 2d 176, 190 (1988); *People v. Keene*, 169 Ill. 2d 1, 10 (1995).

Defendant argues that the proffered hearsay statement was admissible because it fell within two exceptions to the hearsay rule. "Under the 'completion doctrine,' when a portion of a conversation is related by a witness, the opposing party has a right to bring out the remainder of that conversation to prevent the trier of

fact from being misled." *People v. Ward*, 154 Ill. 2d 272, 311 (1992); accord *People v. Weaver*, 92 Ill. 2d 545, 556-57 (1982) (and cases cited therein). However, the testimony regarding the conversation must actually be misleading. "A defendant has no right to introduce portions of a statement which are not necessary to enable the jury to properly evaluate the portions introduced by the State." *People v. Olinger*, 112 Ill. 2d 324, 338 (1986).

In the present case, Pettaway's testimony did not prejudice defendant, *i.e.*, it was not misleading. Pettaway never indicated that Ward wanted to meet with defendant and Williams to plan these crimes. Further, Pettaway testified that: he and Ward had smoked crack cocaine together; he knew that defendant was a drug dealer; he had previously bought drugs from defendant; and he had seen Ward buy drugs from defendant. Thus, there was abundant testimony by Pettaway from which defendant's trial counsel could argue that the meetings between Ward and defendant were motivated by a desire to buy drugs. Moreover, defendant himself testified that, at the first meeting that Pettaway related, defendant and Ward left the parking lot, went to the nearby apartment of Ward's girlfriend, and completed a drug transaction. Consequently, the proffered hearsay statement was not necessary to prevent jurors from being misled by Pettaway's testimony. See, *e.g.*, *Ward*, 154 Ill. 2d at 312; *People v. Harris*, 236 Ill. App. 3d 574, 580-81 (1992).

Defendant argues that the proffered hearsay statement was admissible also because it fell within the "state-of-mind" exception to the hearsay rule. Statements that indicate the declarant's state of mind are admissible as exceptions to the hearsay rule when the declarant is unavailable to testify, there is a reasonable probability that the proffered hearsay statements are truthful, and the statements are relevant to a material issue in the case. *People v. Floyd*, 103 Ill. 2d 541, 546 (1984).

Defendant points to the above-mentioned corroborative portions of Pettaway's testimony as support for the truthfulness of Ward's hearsay statement. These facts do indicate that Ward possibly wanted to buy drugs from defendant. However, they do not indicate the reliability of Ward's statement to Pettaway; they do not add up to a reasonable probability of the truthfulness of Ward's statement. On the one hand, it is not *inherently* likely that a drug user would tell the truth to a fellow drug user about wanting to buy drugs. On the other hand, it must be remembered that Ward was jointly charged with defendant of committing these crimes. It is *inherently* likely that a person would want to conceal from another the fact that he was meeting with others to plan a murder and a kidnapping. Ward obviously had a greater reason to lie about his motive for finding defendant than to tell the truth. There was no reasonable probability that Ward's hearsay statement was truthful.

In any event, if Ward's hearsay statement was admissible to show his state of mind, the exclusion of the statement was harmless. Error in the exclusion of hearsay testimony is harmless where the excluded evidence is merely cumulative of other evidence presented by the parties. See *People v. Bartall,* 98 Ill. 2d 294, 318-20 (1983); *People v. Kline,* 92 Ill. 2d 490, 503-04 (1982).

In this case, Pettaway's testimony itself contained significant evidence from which defendant could argue that Ward wanted to find defendant to buy drugs. Further, defendant actually testified to the subject matter of Ward's hearsay statement. Defendant testified that he sold crack cocaine to Ward at the first meeting to which Pettaway testified. This further supports a conclusion that the exclusion of Ward's testimony was harmless. See *People v. Nyberg,* 275 Ill. App. 3d 570, 580-81 (1995); *People v. Hudson,* 198 Ill. App. 3d 915, 923-25 (1990). Pettaway's testimony regarding his drug relation-

ship with Ward, combined with defendant's own testimony that he sold drugs to Ward, was at least as strong as Ward's excluded hearsay statement. Therefore, any error in its exclusion was harmless.

## B. *Williams' Excluded Hearsay Statements*

### 1

Kimberly Young testified that, on three separate occasions, Williams falsely told her that Williams was pregnant. Defendant's trial counsel asked Young if Williams told her why Williams needed to tell a man she was pregnant. The trial court then sustained the State's objection on hearsay grounds. Defense counsel made an offer of proof of Young's testimony. Williams told Young that Williams would falsely tell a man that she was pregnant to keep him. Defendant argues that Williams' hearsay statement to Young fell into the same two hearsay exceptions as Ward's hearsay statement: the completion doctrine and the state-of-mind exception.

Neither hearsay exception applies here. The completion doctrine does not apply because Young was *defendant's* witness. All of Young's testimony and her proffered testimony was presented during defendant's direct examination of her. Thus, there is no issue of clarifying partial and misleading testimony elicited *by the opposing party*. See *Ward*, 154 Ill. 2d at 311 (stating rule).

Also, the state-of-mind exception does not apply here. As with Ward's excluded hearsay statement, there is no reasonable probability that this hearsay statement of Williams was truthful. The record does not disclose any reason to regard the casual conversation among these acquaintances as inherently reliable.

If the state-of-mind exception did apply to Williams' hearsay statement to Young, the exclusion of the statement was harmless. Defendant presented much additional evidence regarding Williams deceiving others,

including defendant, with her lies of being pregnant. In the State's case at least three persons—Martin, Turner, and Killeen—so testified. Moreover, defendant himself so testified. Defendant also presented additional evidence of her jealous and possessive nature regarding him. See *Bartall*, 98 Ill. 2d at 318-20; *Nyberg*, 275 Ill. App. 3d at 580-81.

## 2

Pauline Randle was the mother of defendant's former girlfriend, Latrina Montgomery. Randle testified as follows. In early 1995, she received 15 to 20 telephone calls from the same woman. Randle had never heard the woman's voice prior to these calls, nor had she spoken to Williams in person. The State objected. During the resulting sidebar, defendant made the following offer of proof. Randle would testify that, in the first call, the woman identified herself as Williams' mother. In subsequent calls, the woman identified herself as Williams. Also, Randle's "caller ID" indicated that the calls came from Williams' home. Williams told Randle that she was pregnant with defendant's child, and that Randle should tell her daughter to stay away from defendant. The trial court excluded the testimony, finding that there was no showing as to who made the phone calls.

Telephone conversations that are relevant to the issues at trial are competent if a proper foundation is laid. A mere assertion by the other person as to his or her identity, being hearsay, cannot be taken as a sufficient showing of the other person's identity. *People v. Poe*, 121 Ill. App. 3d 457, 460 (1984); accord M. Graham, Cleary & Graham's Handbook of Illinois Evidence § 901.7 (7th ed. 1999). Testimony as to a telephone conversation between a witness and another person is inadmissible in the absence of a claim by the witness that he or she knows the other person or can identify the person's voice or other corroborative circumstances from which the caller

can be identified as the person who talked to the witness. *People v. Abrego*, 142 Ill. App. 3d 973, 981-82 (1986) (and cases cited therein); accord 2 J. Strong, McCormick on Evidence § 226, at 52 (5th ed. 1999).

Caller identification ("caller ID") information is one such corroborative circumstance. While the admissibility of caller ID evidence appears to be an issue of first impression in Illinois, other courts have considered the issue. The information displayed on a caller ID device is not hearsay because there is no out-of-court asserter (see *Olinger*, 176 Ill. 2d at 357 (stating hearsay rule)); " 'the caller ID display is based on computer generated information and not simply the repetition of prior recorded human input or observation.' " *Culbreath v. State*, 667 So. 2d 156, 162 (Ala. Crim. App. 1995), quoting *Tatum v. Commonwealth*, 17 Va. App. 585, 588, 440 S.E.2d 133, 135 (1994). We agree with this reasoning and hold that the only requirement necessary for the admission of caller ID evidence is that the caller ID device be proven reliable. See *Culbreath*, 667 So. 2d at 162; *Tatum*, 17 Va. App. at 588-89, 440 S.E.2d at 135-36.

The reliability of a caller ID device must be made on a case-by-case basis in light of the specific facts and circumstances. In other words, it would not be appropriate to find that a particular type or brand of caller ID device is always reliable. Reliability may be established when the witness testifies that when he or she received telephone calls, the witness checked the caller ID and that the same number always appeared for the same caller. See *Culbreath*, 667 So. 2d at 162.

In this case, Randle's caller ID displayed Williams' name for each of the 15 to 20 telephone calls from the same woman. We hold that the reliability of Randle's caller ID was established in this case. The circumstance of Randle's caller ID, with the other circumstances described in defendant's offer of proof, provided a suf-

ficient foundation for Randle's testimony regarding the content of the telephone conversations. Its exclusion constituted error.

However, this error was harmless because there was other evidence of Williams' jealousy and animosity toward Montgomery. Indeed, Montgomery herself testified that she had verbal and physical altercations with Williams. Thus, there was testimony to corroborate Williams' jealousy and threats at the time of Randle's telephone conversations. Therefore, any error was harmless. See *Bartall*, 98 Ill. 2d at 318-20.

### C. *Iacullo's Excluded Hearsay Statements*

The arrest of defendant and Williams led police to question Iacullo. She gave statements to police on November 18, 1995, and several times thereafter, which included the following. Early on November 17, Williams arrived at Iacullo's house with a baby. The baby's umbilical cord was dripping blood, so Iacullo gave Williams gauze and tape. Williams was wearing a light-colored shirt that had blood on it and she had a fresh cut on her hand. Williams gave Iacullo Edwards' Grambling Tigers starter jacket and told her to give it to defendant as a "new daddy present." Iacullo drove Williams to Williams' house. There, Iacullo showed defendant the baby and said "surprise, Baby Fedell, Jr." Iacullo also gave the jacket to defendant. Also, at Williams' behest, Iacullo prepared a false birth certificate and gave it to Williams outside of defendant's presence.

The State charged Iacullo with obstruction of justice relating to her involvement in these crimes. Invoking the fifth amendment, she refused to testify on defendant's behalf. The trial court excluded Iacullo's statements.

### 1

Defendant argues that Iacullo's statements fell within the statement-against-penal-interest exception to the

hearsay rule. Generally, an unsworn extrajudicial declaration that the declarant committed the crime, and not the defendant on trial, is inadmissible hearsay, even though the declaration is against the declarant's penal interest. *People v. Bowel*, 111 Ill. 2d 58, 66 (1986). However, where constitutional rights that directly affect the ascertainment of guilt are implicated, the hearsay rule may not be mechanically applied to defeat the ends of justice. Therefore, where hearsay testimony bears persuasive assurances of trustworthiness and is critical to the accused's defense, its exclusion deprives the defendant of a fair trial in accord with due process. *People v. Thomas*, 171 Ill. 2d 207, 215-16 (1996), citing *Chambers v. Mississippi*, 410 U.S. 284, 302, 35 L. Ed. 2d 297, 313, 93 S. Ct. 1038, 1049 (1973). Such testimony may be admissible under the statement-against-penal-interest exception to the hearsay rule. *Bowel*, 111 Ill. 2d at 66. *Chambers* established four factors to help determine the reliability of a hearsay statement: (1) the statement was spontaneously made to a close acquaintance shortly after the crime occurred; (2) the statement is corroborated by other evidence; (3) the statement is self-incriminating and against the declarant's interests; and (4) there was adequate opportunity for cross-examination of the declarant. *Chambers*, 410 U.S. at 300-01, 35 L. Ed. 2d at 311-12, 93 S. Ct. at 1048-49. The presence of all four factors is not a condition of admissibility. Rather, the question to be considered in deciding the admissibility of such an extrajudicial statement is whether it was made under circumstances which provide considerable assurance of its reliability by objective indicia of trustworthiness. *Thomas*, 171 Ill. 2d at 216.

Iacullo's statements were not made under circumstances that provide considerable assurance of reliability. The first *Chambers* factor was not established. Iacullo's statements were neither spontaneous nor made to a close acquaintance.

Defendant cites to *People v. Rivera*, 915 F.2d 280, 282 (7th Cir. 1990), where a federal appeals court referred to the first *Chambers* factor as a "silly" reason for excluding a third party's confession. Regardless of that court's opinion of the first *Chambers* factor, in passing on federal constitutional questions, this court is bound only by decisions of the United States Supreme Court. Decisions of lower federal courts are not conclusive on state courts, except insofar as the decision of the lower federal court may become the law of the case. *People v. Kokoraleis*, 132 Ill. 2d 235, 293-94 (1989). Illinois courts have affirmed the exclusion of hearsay based, in part, upon the fact that the statements were made to the police rather than to a close acquaintance. See, *e.g.*, *Thomas*, 171 Ill. 2d at 216; *People v. Black*, 80 Ill. App. 3d 116, 121 (1980) (spontaneous admissions to friend or confidant more likely reliable than calculated statements made to a police officer).

Also, *Rivera*, as well as *People v. Anderson*, 291 Ill. App. 3d 843 (1997), and *People v. Kokoraleis*, 149 Ill. App. 3d 1000 (1986), to which defendant also cites, are distinguishable from this case. In each of those cases, the hearsay statement was an actual confession to the same crime for which that defendant was charged, and there was no indication that the declarant was attempting to limit his own liability. *Rivera*, 915 F.2d at 281; *Anderson*, 291 Ill. App. 3d at 847; *Kokoraleis*, 149 Ill. App. 3d at 1017. The statements by the declarants in those cases were more likely to be trustworthy because their confessions, in which they did not implicate others, would clearly not benefit them and, in fact, would possibly lead to criminal prosecution. *Kokoraleis*, 149 Ill. App. 3d at 1020-21, citing *Chambers*, 410 U.S. at 301, 35 L. Ed. 2d at 312, 93 S. Ct. at 1048; *Anderson*, 291 Ill. App. 3d at 851.

However, in the present case, Iacullo's statements did

not constitute a confession to the same crimes for which defendant was charged, nor was it a confession in which she implicated others. Iacullo's statements indicated that Williams gave Iacullo the jacket and told her to give it to defendant; that Iacullo and Williams drove together to Williams' home where Iacullo showed the baby to defendant; and that Williams was also involved in the preparation of the false birth certificate. The indicia of trustworthiness reflected by the first *Chambers* factor are not present.

The second *Chambers* factor was established. There is evidence to corroborate Iacullo's statements.

The third *Chambers* factor was not established. Whether a statement is actually against the declarant's interest must be determined from the circumstances of each case. For example, a statement admitting guilt and implicating another person, made while in custody, may well be motivated by a desire to curry favor with the authorities and, accordingly, fail to qualify as against interest. See *Williamson v. United States*, 512 U.S. 594, 601-02, 129 L. Ed. 2d 476, 484, 114 S. Ct. 2431, 2436 (1994) (interpreting Fed. R. Evid. 804(b)(3)).

In this case, almost all of Iacullo's statements were not self-incriminating and against her interests. There is no crime in: allowing into one's home a friend who claims to have just given birth; helping to bandage a baby; driving that friend to her home and presenting the baby to the alleged father; or giving someone a jacket. While Iacullo's statement regarding the false birth certificate was somewhat self-incriminating, it was not against her interest. Rather, it was against the interests of Williams. The statement implicated Williams as the central figure. According to the statement, it was Williams who initiated the quest for the false paperwork.

The fourth *Chambers* factor is not established. Invoking the fifth amendment, Iacullo was not available for

cross-examination by the State. "Although general practice is to speak loosely of unavailability of the witness, the critical factor is actually the unavailability of the witness' testimony. Witnesses may be physically present in court but their testimony nevertheless unavailable." 2 J. Strong, McCormick on Evidence § 253, at 127 (5th ed. 1999). "The exercise of privilege to avoid testifying, as in the case before us, is a classic example of a witness being available in person but not [the witness'] testimony." *Naylor v. Gronkowski,* 9 Ill. App. 3d 302, 306 (1972).

The unavailability of a witness based on privilege is recognized at common law (*Naylor,* 9 Ill. App. 3d at 306) and the Federal Rules of Evidence. Rule 804(a) of the Federal Rules of Evidence provides:

"(a) Definition of unavailability. 'Unavailability as a witness' includes situations in which the declarant—

(1) is exempted by ruling of the court on the ground of privilege from testifying concerning the subject matter of the declarant's statement; or

(2) persists in refusing to testify concerning the subject matter of the declarant's statement despite an order of the court to do so; or

(3) testifies to a lack of memory of the subject matter of the declarant's statement; or

(4) is unable to be present or to testify at the hearing because of death or then existing physical or mental illness or infirmity; or

(5) is absent from the hearing and the proponent of a statement has been unable to procure the declarant's attendance (or in the case of a hearsay exception under subdivision (b)(2), (3), or (4), the declarant's attendance or testimony) by process or other reasonable means.

A declarant is not unavailable as a witness if exemption, refusal, claim of lack of memory, inability, or absence is due to the procurement or wrongdoing of the proponent of a statement for the purpose of preventing the witness from attending or testifying."

While this court has not adopted Rule 804(a) as an exhaustive definition of "unavailability" under Illinois law, this court has embraced the general principles reflected therein:

> "The general thrust of the rule makes clear that 'unavailability' is a narrow concept, subject to a rigorous standard. The reasons for unavailability which are acceptable under Federal Rule 804—privilege, persistent contemptuous refusal to testify, failure of memory, death or illness, etc.— are substantial and therefore legally cognizable." *People v. Johnson*, 118 Ill. 2d 501, 509 (1987).

A witness' exercise of a privilege satisfies the requirement of unavailability. Fed. R. Evid. 804(a)(1). Accordingly, a declarant who asserts his or her fifth amendment right not to testify is not available for cross-examination in the context of the fourth *Chambers* factor. *People v. Swaggirt*, 282 Ill. App. 3d 692, 703 (1996) (collecting cases); *People. v. Carter*, 174 Ill. App. 3d 369, 374 (1988); see *People v. Rice*, 166 Ill. 2d 35, 44 (1995).

Defendant argues that Iacullo was available for cross-examination, even though she had invoked her fifth amendment rights, because the State could have granted her immunity. In *People v. Rivera*, 260 Ill. App. 3d 984, 992 (1994), the appellate court accepted this argument in finding that the fourth *Chambers* factor was established in that case:

> "In *People v. Ireland* (1976), 38 Ill. App. 3d 616, 621-22, 348 N.E.2d 277, 281-82, this court ruled that the State had effectively prevented itself from cross-examining a declarant who invoked the fifth amendment by refusing to grant the declarant immunity and that the declarant therefore could not have been held to have been unavailable. The precedent in *Ireland* is applicable to the present case. The State in effect made [the witness] unavailable by refusing to grant him immunity."

However, a defendant does not have a constitutional right to compel the State to confer immunity upon a witness who has exercised his or her privilege against self-

incrimination. *Carter*, 174 Ill. App. 3d at 375, citing *United States v. Ramsey*, 503 F.2d 524, 532 (7th Cir. 1974); *People v. Cunningham*, 130 Ill. App. 3d 254, 264-65 (1984). To the extent that *Rivera* and *Ireland* hold to the contrary, those cases are overruled. We find that the fourth *Chambers* factor has not been met.

Defendant has failed to establish three of the four *Chambers* factors. We cannot say that the trial court abused its discretion in excluding Iacullo's hearsay statements because they lacked sufficient indicia of reliability.

### 2

In a related claim, defendant contends that during closing argument the prosecutor improperly made three remarks regarding defendant's failure to call Iacullo as a witness, and one remark regarding Iacullo's race. A prosecutor remarked: "Don't you get hung up on Vicky [*sic*] Iacullo. This isn't about her trial because she is not on trial. This is the defendant's trial. Don't let that red hearing [*sic*] throw you off. Her day in court will come." In rebuttal, a prosecutor remarked:

> "You heard about Dorothy Hale about being involved in disposing of this gun. What you heard that was just raised by [defense counsel], what was her motive? You may never know. You won't know. You didn't hear any evidence. Why she got involved in this. Vicky [*sic*] Iacullo. Why was she involved in this?"

Subsequently, a prosecutor remarked: "Ladies and gentlemen, based on all the evidence in this case you cannot and you must not accept that ridiculous ludicrous explanation that Vicky [*sic*] Iacullo for reasons we have never been presented for circumstances that no one can comprehend planted this evidence on him." Defendant also assigns as prejudicial error the following remark early in the State's closing argument:

> "Look at what he [defendant] said. *** The actions of the defendant at 3:00 o'clock in the morning, his statements and his actions. His girlfriend comes home from just hav-

ing a new baby ***. I'm sure you are exhausted. He packs up, new wife and kid, and drives back to Wheaton at 3:00 o'clock in the morning to call relatives to come see them at this third party's house in Wheaton. Well, that's ridiculous. That's not what a reasonable person does. And it's because he knew he had to legitimize his lie because the police hadn't been there yet when these things are happening. His little lie passing off Elijah to the rest of the world as Fedell, Jr., was still going to happen. What better way than to have grandma be the witness test [sic] if we can pass this off to the world. What better way to legitimize my lies then [sic] to have this third party, white woman that nobody has ever seen before named Vicky [sic] be there and help describe this miracle birth ***."

However, the record shows that defendant's trial counsel either failed to object at trial to these remarks, or failed to raise these specific issues in defendant's post-trial motion. This issue is, therefore, waived. *Enoch,* 122 Ill. 2d at 186; *People v. Jackson,* 84 Ill. 2d 350, 358-59 (1981); *People v. Buckner,* 121 Ill. App. 3d 391, 395 (1984).

Defendant invokes the plain error exception to the waiver rule. 134 Ill. 2d R. 615(a). Plain error is a limited and narrow exception to the waiver rule, to be invoked only where the evidence is so closely balanced that it might be said that the jury's verdict may have resulted from the error, or the error is so substantial that it deprived the defendant of a fair trial. *People v. Herrett,* 137 Ill. 2d 195, 209-10 (1990); *People v. Carlson,* 79 Ill. 2d 564, 576-77 (1980).

The plain error exception to the waiver rule does not save this issue. First, the evidence was not so closely balanced that the jury's guilty verdict may have resulted from these remarks. We previously recounted the evidence adduced at trial; we need not repeat it in detail. While defendant presented an alibi defense at trial, he does not now contend that the evidence against him was insufficient to establish guilt beyond a reasonable doubt.

According to Scott's testimony, Joshua stated that defendant was one of the "burglars" who "cut" his mother and sister. Joy Wilson saw defendant in his automobile with Williams and Ward, who was wearing bloodstained clothing. Subsequently, Patrice Scott saw defendant with Elijah and saw defendant brutally kill Joshua. This eyewitness testimony was corroborated by compelling circumstantial evidence, including forensic and other physical evidence. Months prior to the crime, defendant asked Ward whether he wanted a knife or a gun when Ward said that he wanted to kill Debra. Defendant participated in the telephone call to Tina Martin at 3:30 a.m. the morning after the crimes. The bedsheet stained with Joshua's blood, found in the area of his body, came from defendant's and Williams' town house. At the time of his arrest, defendant was wearing a jacket that not only was stolen from Debra's home, but was stained with Elijah's blood. We cannot say that the jury's guilty verdict would have been otherwise had the prosecutor not made the challenged remarks. See, *e.g.*, *Jackson*, 84 Ill. 2d at 360; *Buckner*, 121 Ill. App. 3d at 396-97.

Second, the claimed improper remarks were not so substantial that they deprived defendant of a fair trial. "In reviewing allegations of prosecutorial misconduct, the closing arguments of both the State and the defendant must be examined in their entirety, and the complained-of remarks must be placed in their proper context." *People v. Kitchen*, 159 Ill. 2d 1, 38 (1994).

A review of the challenged prosecutorial remarks shows that they were aimed at the lack of evidence regarding Iacullo's and Hale's involvement in the case generally; the remarks were not aimed specifically at defendant's failure to call Iacullo as a witness. See *Keene*, 169 Ill. 2d at 22-23 (State properly kept its remarks to the "what" of the evidence and did not stray into the "who" of the issue).

In any event, the record shows that the defense injected Iacullo into the trial, by defendant's testimony, and by defense counsel's opening statement and closing argument. Where defendant injected Iacullo's name into the case, the prosecutor's comments regarding the lack of such evidence was not improper. See *People v. Kubat*, 94 Ill. 2d 437, 496-98 (1983).

The prosecutor's reference to a "red herring" was not reversible error, much less plain error. In the context of this entire argument, the phrase was an allowable reference to relevance and credibility. See *People v. Phillips*, 127 Ill. 2d 499, 525 (1989).

While the prosecutor's reference to Iacullo's race was unnecessary and potentially offensive, it was not intended to incite racial prejudice, nor did it have that effect for several reasons. First, the remark was isolated. The prosecutor did not dwell on the issue of race. This remark is distinguishable from prosecutorial arguments condemned in cases such as *People v. Lurry*, 77 Ill. App. 3d 108, 113-14 (1979). Second, the trial court instructed the jury that it was to consider only the evidence and not counsels' remarks, and also instructed the jury that it could not be influenced by race. We cannot say that the guilty verdict would likely have been different had the prosecutor not made the remark. See, *e.g.*, *People v. Thomas*, 137 Ill. 2d 500, 543-44 (1990); *People v. Johnson*, 114 Ill. 2d 170, 199 (1986). Accordingly, we find no plain error, and defendant's procedural default of this issue is not excused.

We note defendant's alternative assertion that he was denied the effective assistance of counsel when his trial counsel failed to preserve this issue for review. To demonstrate ineffective assistance of counsel, a defendant must show that: (1) the attorney's performance fell below an objective standard of reasonableness, and (2) the attorney's deficient performance prejudiced the defendant.

Because the defendant must satisfy both prongs of this test, the failure to establish either is fatal to the claim. *Strickland v. Washington*, 466 U.S. 668, 687, 697, 80 L. Ed. 2d 674, 693, 699, 104 S. Ct. 2052, 2064, 2069 (1984).

In this case, we can dispose of defendant's assertion of ineffective assistance of counsel on the "prejudice" prong alone. We have concluded that the challenged remarks did not constitute reversible error. The trial court would have rightfully rejected any defense challenge to the remarks. Consequently, had defendant's counsel brought these alleged errors to the attention of the trial court, the result would have been no different than the effect of his failure to do so. This purported ineffective assistance of his trial counsel did not prejudice defendant. See, *e.g.*, *People v. Kuntu*, 196 Ill. 2d 105, 129-30 (2001); *People v. Shaw*, 186 Ill. 2d 301, 332 (1998). In sum, we cannot say that the trial court abused its discretion in excluding these hearsay statements.

II. Admissible Hearsay Statements: Iacullo and Hale

Defendant next points to hearsay statements made by Iacullo and Hale that the trial court ruled would be admissible. Defendant claims that he was denied the effective assistance of counsel when his trial counsel failed to introduce these various statements at trial.

The hearsay statements included the following. Ryan Berger could have testified that on November 16, 1995, a few hours prior to Debra's murder, Iacullo asked him how to clean fingerprints off a gun. Also, between midnight and 4 a.m. on November 17, Iacullo telephoned Berger, asking him how to clean powder burns off her hand. Patricia Mitchell could have testified that Iacullo told her that Iacullo saw a gun under the front seat of Iacullo's car and was concerned that her fingerprints might be on that gun.

David Drenk could have testified that in the early fall of 1995, Iacullo asked him to loan her a gun. One day to

one week prior to these crimes, Iacullo asked Drenk if he could obtain a false birth certificate and he said no. On November 16, 1995, Drenk was at Iacullo's apartment and saw Williams there. On November 17, Iacullo asked Drenk for help in obtaining a birth certificate. On November 18, Iacullo told Drenk that she would alter a birth certificate by whiting out information and making a photocopy with the false information. A few days subsequent to these crimes, Iacullo told Drenk that she was going to throw the gun in the Fox River. Iacullo told Hale to get cleaner from under the kitchen sink to wipe fingerprints off a gun.

Lastly, Detective Joseph Lullo could have testified that he interviewed Hale on December 1, 1995. She told him that on November 26, Iacullo told Hale to use vinegar and a cloth diaper to wipe fingerprints off a gun, six bullets, and a magazine.

Defendant characterizes these hearsay statements as exculpatory, or at least corroborative of the defense theory of the case. He contends that his trial counsel's failure to present them was constitutionally deficient and prejudicial.

We can dispose of this assertion on the prejudice prong of *Strickland* alone. None of these hearsay statements exclude defendant from participating in these crimes. At most, they implicate Iacullo and Hale in the planning or cover up of these crimes. Implicating Iacullo and Hale does not exculpate defendant, or diminish the strong evidence of defendant's active participation in these crimes. Further, the jury knew that Iacullo and Hale were involved with the gun and the birth certificate. Accordingly, defendant suffered no prejudice in terms of *Strickland*. See, *e.g.*, *People v. West*, 187 Ill. 2d 418, 431-34 (1999); *People v. Ward*, 187 Ill. 2d 249, 257-58 (1999).

### III. Joshua's Hearsay Statements

Prior to trial, the State petitioned the trial court to

admit Joshua's out-of-court statements under the statutory hearsay exception for child declarants found at section 115—10 of the Code of Criminal Procedure of 1963. See 725 ILCS 5/115—10 (West 1994). The State also offered the statements under the spontaneous declaration exception to the hearsay rule. At the close of a pretrial hearing on the petition, the trial court found that all of the statements were admissible under section 115—10. The court also found that, except for his denial that he took medication, Joshua's statements were also admissible under the common law spontaneous declaration exception to the hearsay rule.

Defendant contends that: Joshua's statements were not admissible (A) under section 115—10 or (B) as spontaneous declarations; and (C) the trial court failed to instruct the jury regarding the use of section 115—10 statements. This court recently discussed this issue in the direct appeal from Williams' trial. We need only refer to that decision.

### A. *Section 115—10*

Applying an abuse of discretion standard to the trial court's ruling (see *Williams*, 193 Ill. 2d at 342-44), we agree with the trial court that Joshua's statements were admissible under section 115—10. They conform to section 115—10(a)(2) (725 ILCS 5/115—10(a)(2) (West 1994)) because Joshua related an act, matter, or detail pertaining to an act that was an element of an offense committed against Joshua. See *Williams*, 193 Ill. 2d at 344-49. Also, the time, content and circumstances of Joshua's statements provided sufficient safeguards of reliability to permit their introduction under section 115—10. In so finding, the trial court considered and weighed the credibility of the witnesses at the hearing and was in the best position to do so. See *Williams*, 193 Ill. 2d at 349-51. For the reasons discussed in our disposition of Williams' appeal, we also reject defendant's argu-

ment that Joshua's identification of defendant as one of the "burglars" was unreliable.

## B. *Spontaneous Declaration*

The trial court correctly decided that Joshua's statements about the events in the Evans apartment were admissible under the spontaneous declaration exception to the hearsay rule. We reject defendant's argument that "so much time had passed that the excitement of the events had dissipated." See *Williams*, 193 Ill. 2d at 352-56.

## C. *Jury Instruction*

Defendant also contends that the trial court erred by failing to instruct the jury as required by section 115—10(c), which provides:

> "If a statement is admitted pursuant to this Section, the court shall instruct the jury that it is for the jury to determine the weight and credibility to be given the statement and that, in making the determination, it shall consider the age and maturity of the child, *** the nature of the statement, the circumstances under which the statement was made, and any other relevant factor." 725 ILCS 5/115—10(c) (West 1994).

Illinois Pattern Jury Instructions, Criminal No. 11.66 (3d ed. 1992) (hereinafter IPI Criminal 3d) tracks this statutory language.

In this case, as in *Williams*, Joshua's statements about the events in the Evans apartment were admissible under the spontaneous declaration exception to the hearsay rule, as well as under section 115—10. IPI Criminal 3d No. 11.66 is not required when statements are admitted under the spontaneous declaration exception. Accordingly, we conclude that the trial court's failure to give this instruction did not deprive defendant of a fair trial. See *Williams*, 193 Ill. 2d at 356-58.

## IV. Prior Consistent Statements

Defendant next contends that the trial court errone-

ously admitted prior consistent statements that improperly bolstered the testimony of (A) Scott and (B) Pruitt. Evidence of statements made prior to trial for the purpose of corroborating testimony at trial is inadmissible unless it has been suggested that the witness recently fabricated testimony or has a motive to testify falsely and the prior statement was made before the motive arose. *People v. Henderson*, 142 Ill. 2d 258, 310 (1990); *People v. Emerson*, 97 Ill. 2d 487, 501 (1983). The prejudicial nature of evidence of prior consistent statements is judged on a case-by-case basis. *Henderson*, 142 Ill. 2d at 311. These evidentiary rulings are within the sound discretion of the trial court and will not be reversed absent an abuse of discretion. *Childress*, 158 Ill. 2d at 296.

### A. *Scott*

Defendant claims that Scott's testimony was improperly bolstered in three ways. None of these assertions warrant reversal.

First, Scott testified that she was in the laundry room at defendant's and Williams' house shortly before she saw defendant and Williams kill Joshua. A prosecutor asked Scott whether she heard Williams say anything to defendant about what Joshua said. Scott answered: "She said that he talked too much and that he knows their names. He named her, Fedell and Vern."

The record shows that defendant's trial counsel neither objected to this testimony nor included this issue in defendant's post-trial motion. Therefore, the issue is waived. *Enoch*, 122 Ill. 2d at 186.

Defendant's invocation of the plain error exception to the waiver rule is unavailing. As we previously discussed, the evidence at trial was not so closely balanced that the jury's guilty verdicts may have resulted from this alleged error. Further, after reviewing the record, we cannot say that this statement deprived defendant of a fair trial.

Second, defendant contends that he was prejudiced when Detective David Wall gave allegedly unresponsive and incorrect testimony. On November 18, Detective Wall conducted a tape-recorded interview of Scott. At that interview, Scott said that Joshua named as the burglars only Williams and Ward; she did not tell Wall that Joshua named defendant. At trial, during cross-examination of Scott, the defense attempted to impeach her with that statement. The defense subsequently called Detective Wall as part of its case. During his testimony, Wall referred to the transcript of the November 18 interview of Scott. Defense counsel asked Wall: "And who did Patrice say to you Joshua said to her was at the apartment?" Wall answered: "Three people: Verne, Annette and Fedell." Attempting to elicit the correct answer, defense counsel again asked Wall what Scott had said about who Joshua had named. Wall answered: "Directly he gave two names. He knew the name Verne, and he knew the name Annette. Indirectly later in this statement she gives us Fedell." Defendant contends that these answers "left the jury with the impression that during the interview Scott said that Joshua had named Fedell, which was simply not true."

Defendant's trial counsel did not object in any way to these inaccurate statements. Accordingly, the issue is waived. *Enoch*, 122 Ill. 2d at 186; *Carlson*, 79 Ill. 2d at 576.

Defendant's invocation of the plain error exception to the waiver rule is unavailing. The evidence at trial was not so closely balanced that the jury's guilty verdicts may have resulted from this error. Also, we cannot say that this excerpt from Wall's testimony denied defendant a fair trial. Directly after Wall's incorrect testimony, the following exchange occurred:

"Q. Did Patrice Scott ever say to you that Joshua Evans said that Annette, Verne and Fedell were at the apartment directly?

A. Not—she did not directly give us Fedell's name.
Q. She said Verne and Annette; is that correct?
A. Yes."

We find no plain error.

Third, defendant claims that Scott's testimony was improperly bolstered with a prior statement from her November 18 interview that defendant stabbed Joshua. As noted earlier, defense counsel attempted to impeach Scott with that interview. Counsel asked Scott whether she told police "the name Fedell on November 18th." Scott responded that she could not remember. On redirect examination, the trial court allowed the State to elicit Scott's prior consistent statement from the interview that defendant stabbed Joshua.

The trial court found that defense counsel's question may have left the jury with the misimpression that Scott had not mentioned defendant at all during the November 18 interview. We cannot say that the trial court abused its discretion in allowing the State to rebut that inference.

## B. *Pruitt*

Defendant claims that Pruitt's testimony was improperly bolstered in two ways. Neither assertion warrants reversal.

First, on November 17, 1995, Pruitt did not tell any of the police officers who questioned him that he had heard Joshua name the "burglars." At trial, Pruitt testified on direct examination that he overheard Joshua say that four burglars came into his home, whose names were Annette, Vern, a name that sounded like Adelle or Ladelle, and a fourth name that Pruitt could not understand. On cross-examination, defense counsel impeached Pruitt with his November 17 omission to police. On the State's redirect examination, over defense objection, Pruitt testified that during an interview on November 18, he told police that Joshua named four burglars,

including one whose name sounded like "Vadelle, Adelle, Ladelle."

Defendant has waived this issue for review. Defense counsel, in re-cross-examination, further questioned Pruitt regarding his contact with police on November 17 and the police interview on November 18. Counsel attempted to raise the inference that Pruitt may have consulted with Scott prior to the November 18 interview. When a defendant objects to certain testimony on direct examination, but then questions the witness on cross-examination concerning that allegedly inadmissible testimony, any error is waived for purposes of appeal. See *People v. Hernandez*, 229 Ill. App. 3d 546, 558 (1992); *People v. Bost*, 80 Ill. App. 3d 933, 951-52 (1980); *People v. Lewis*, 75 Ill. App. 3d 259, 287 (1979). Further, after reviewing the record, we conclude that this issue does not warrant our consideration under the plain error doctrine.

Second, without defense objection, the State played to the jury a tape recording of Pruitt's 911 call to police. The State did not provide a reason for its admission, and the trial court did not give the jury a limiting instruction concerning a nonhearsay purpose. Defendant concedes that the 911 call was admissible for nonhearsay purposes. See, *e.g.*, *Williams*, 181 Ill. 2d at 312-13. However, defendant contends that reversible error occurred when the trial court failed to give the jury a limiting instruction "and when the prosecutor used the evidence substantively in closing argument to prove the truth of the matter asserted during the call and to bolster Pruitt's in-court testimony."

We cannot accept this contention. When a prosecutor asked permission to play the tape and distribute transcripts to the jury, the trial court called for a sidebar. The court specifically asked defendant's trial counsel if there were any response to the State's request, and counsel

replied: "No objection, Judge." Thus, the record shows that defendant acquiesced in the admission of this evidence. When a party procures, invites, or acquiesces in the admission of evidence, even though the evidence is improper, that party cannot contest the admission on appeal. *People v. Payne*, 98 Ill. 2d 45, 50 (1983) (and cases cited therein); accord *People v. Williams*, 192 Ill. 2d 548, 571 (2000).

## V. Testimony Regarding Soiled Clothing

Defendant next contends that the trial court erred in excluding Susan Doelker's testimony that she found soiled clothing in the laundry room of Scott's apartment building soon after the crimes. The following was adduced at a separate hearing outside the presence of the jury. Doelker lived in the same apartment building as Scott. On November 17, 1995, or November 20, she saw clothing in a garbage can in the laundry room. She found, *inter alia*, a black hooded sweatshirt, one pair of men's jeans, and one pair of women's jeans. On the clothing was a slimy, colorless fluid that smelled bad. The women's jeans had blood on the inside of the crotch area, but did not have blood on the outside of them.

The trial court ruled that Doelker could testify about the black hooded sweatshirt because there had been testimony that the possible offenders wore hooded sweatshirts. However, the court found that evidence regarding both pairs of the jeans were not relevant and, therefore, inadmissible.

The controlling principles are settled:

" 'The test of the admissibility of evidence is whether it fairly tends to prove the particular offense charged' [citation], and whether what is offered as evidence will be admitted or excluded depends upon whether it tends to make the question of guilt more or less probable; *i.e.*, whether it is relevant [citation]. A trial court may reject offered evidence on grounds of irrelevancy if it has little probative value due to its remoteness, uncertainty or its

possibly unfair prejudicial nature. [Citations.] The admission of evidence is within the sound discretion of the trial court, and its ruling should not be reversed absent a clear showing of abuse of that discretion." *Ward*, 101 Ill. 2d at 455-56.

According to defendant: "It is reasonable to infer that the clothes Doelker found belonged to Ward and Williams." Defendant reasons: "The judge found that the hooded sweatshirt was sufficiently connected to the crime. The other clothes were found with the sweatshirt; thus, they must have been left there by the same person."

We agree with the State that this argument reaches too far for many reasons. The clear, slimy fluid may not have been associated with pregnancy or birth; it could have been any number of other smelly liquids. Further, there was no testimony that the pair of men's jeans had blood on them. However, Joy Wilson saw Ward wearing bloodstained pants; she never said anything regarding a clear, slimy, smelly liquid. Also, the pair of women's jeans had blood only on the inside crotch area. Blood that came from Debra or Elijah would have been on the outside of the criminal's pants. Lastly, the clothing was not sufficiently connected to Scott. It could have been put there by anyone. There was no testimony that the laundry room was ever locked. We conclude that the connections between the jeans and the crime and between the jeans and Scott were so remote and speculative that the trial court could find that Doelker's testimony would have little probative value.

Defendant adds that the trial court's exclusion of this evidence was particularly prejudicial because his trial counsel told the jury in his opening statement that they would hear evidence regarding soiled clothes found in Scott's laundry room—but the jury did not. However, the trial court ruled that Doelker could testify regarding the hooded sweatshirt. Defendant's trial counsel chose not to

offer her testimony regarding that item. Thus, it cannot be said the trial court's ruling prejudiced defendant. We cannot say that the trial court abused its discretion in excluding this evidence.

## VI. Witness-Accomplice Instruction: Scott

Defendant next contends that the trial court erred in refusing to instruct the jury on Scott's testimony as an accomplice. At the jury instruction conference, defendant tendered the pattern accomplice-witness instruction: "When a witness says he was involved in the commission of a crime with the defendant, the testimony of that witness is subject to suspicion and should be considered by you with caution. It should be carefully examined in light of the other evidence in the case." IPI Criminal 3d No. 3.17. The trial court ruled that there was insufficient evidence to warrant the instruction.

The test for determining whether a witness is an accomplice for purposes of the accomplice-witness instruction is whether there is probable cause to believe that the witness was guilty of the offense at issue as a principal, or as an accessory under an accountability theory. Thus, an accomplice-witness instruction should be given to a jury if all the evidence and the reasonable inferences therefrom establish probable cause to believe not merely that the witness was present and failed to disapprove of the crime, but that the witness participated in the planning or commission of the crime. If probable cause is established, the instruction should be given despite the witness' protestations that he or she did not so participate. A reviewing court will not overturn a trial court's refusal to give an accomplice-witness instruction absent an abuse of discretion. *People v. Kirchner*, 194 Ill. 2d 502, 541 (2000); *People v. Harris*, 182 Ill. 2d 114, 144-45 (1998).

In this case, defendant argues that Scott could have been charged with Joshua's murder on an accountability

theory. However, the trial court found that the evidence did not show probable cause to believe that Scott was guilty of these offenses, either as a principal or as an accessory. Our review of the record supports that finding.

There is no evidence that Scott participated in the planning or commission of Joshua's murder. Defendant points to evidence that Joshua: stated that Williams was one of the burglars who "cut" his mother and sister; and vomited after Williams gave him "medicine" that he claimed he did not take. However, we see no reason to reject the trial court's reasoning that Scott had no reason to disbelieve her friend Williams, who said that Joshua, whom Scott had just met, was lying, and that he was on medication.

Mere presence at the scene of a crime is insufficient to render one liable for the acts of another. A person conscious that a crime is being committed in his or her presence will not be held accountable merely for failing to oppose or stop the crime. *People v. Jones*, 86 Ill. App. 3d 278, 282 (1980); *People v. Tillman*, 130 Ill. App. 2d 743, 750 (1971). Rather, an accomplice must take some part, perform some act, or owe some duty to the person in danger that makes it incumbent on him or her to prevent the commission of the crime. *Henderson*, 142 Ill. 2d at 314. There is evidence in the record that, at most, makes Scott an accessory to these crimes after the fact. However, the accomplice-witness instruction need not be given where the witness was not involved in any way until after the commission of the crime. *People v. Turner*, 92 Ill. App. 3d 265, 268 (1980) (and cases cited therein). We cannot say that the trial court abused its discretion in refusing the accomplice-witness instruction regarding Scott's testimony.

### VII. Cumulative Error

Defendant next contends that even if no individual error warrants reversal of his conviction, the cumulative

effect of the previously alleged errors deprived him of a fair trial. We disagree. We have rejected all but one of defendant's claims of error at the guilt phase of his trial. We have concluded either that no error occurred at all, or any error that may have occurred did not rise to the level of plain error. Accordingly, defendant is not entitled to a new trial on the basis of cumulative error. See, *e.g.*, *People v. Hall*, 194 Ill. 2d 305, 350-51 (2000).

## Eligibility Phase

### VIII. Jury Instructions

The jury, in separate death-eligibility verdicts, found beyond a reasonable doubt the presence of seven statutory aggravating factors. Defendant now challenges five of these verdicts, complaining of language in their correlative jury instructions. He claims that he is entitled to a new death sentencing hearing.

However, any error in the five jury instructions did not deprive defendant of a fair death sentencing hearing. Two death-eligibility verdicts remain, based on the statutory aggravating factor that Joshua was killed in the course of another felony (720 ILCS 5/9—1(b)(6) (West 1994)) and that Joshua was killed to prevent him from giving material assistance to the State (720 ILCS 5/9—1(b)(8) (West 1994)). Defendant does not complain of their correlative jury instructions. It is settled that the Illinois death penalty statute does not place special emphasis on any single aggravating factor and does not accord any added significance to multiple aggravating factors as opposed to a single aggravating factor. The finding of a statutory aggravating factor at the eligibility phase serves to narrow the class of persons who may be sentenced to death; once one such factor is proved, the defendant is eligible, regardless of whether other factors have been proved. Thus, where a defendant is found eligible based upon two or more statutory aggravating

factors, the fact that one of those factors may later be invalidated will not generally impair the eligibility finding as long as a separate valid aggravating factor supported eligibility. *People v. Brown*, 169 Ill. 2d 132, 164-65 (1996); accord *Williams*, 193 Ill. 2d at 362-63; *People v. Page*, 156 Ill. 2d 258, 268-69 (1993).

We likewise reject defendant's ineffective assistance of counsel argument. Even had defense counsel brought the alleged errors pertaining to the five death-eligibility verdicts to the attention of the trial court, two such verdicts remained. Thus, the result would have been no different from the effect of his failure to act. This purported ineffective assistance of his trial counsel did not prejudice defendant. See, *e.g.*, *Williams*, 181 Ill. 2d at 320-22.

Defendant additionally argues: "Because it cannot be concluded beyond a reasonable doubt that the jury's erroneous consideration of five out of seven statutory aggravating factors did not contribute to the jury's verdict, [defendant's] death sentence should be vacated and the case remanded for a new sentencing hearing." We disagree. Resentencing is necessary where the sentencer, at the penalty phase of the death sentencing hearing, might have considered an aggravating factor that was not supported by the evidence. Assuming *arguendo* that five death-eligibility factors were invalid, the jury was, nevertheless, entitled to consider *any* aggravating evidence, including defendant's same conduct, in determining defendant's sentence. The elimination of those statutory aggravating factors did not reduce that evidence. An error in those jury instructions did not diminish the weight of the evidence to support defendant's death eligibility under sections 9—1(b)(6) and 9—1(b)(8) of the death penalty statute. See, *e.g.*, *Williams*, 181 Ill. 2d at 321-22; *People v. Pasch*, 152 Ill. 2d 133, 188-90 (1992).

IX. Eligibility Verdict Forms: Sections 9—1(b)(6), (b)(8)

Defendant next contends that each of the seven death-eligibility verdict forms set forth some, but not all, of the elements of the relevant statutory aggravating factor. Defendant does not question the propriety of the jury instructions for the death-eligibility verdicts based on sections 9—1(b)(6) and (b)(8) of the death penalty statute. Thus, we need examine only those two verdict forms. Defendant would remain eligible for the death penalty under these two statutory aggravating factors, even if the other statutory aggravating factors were invalid. See *People v. Cole*, 172 Ill. 2d 85, 102-03 (1996).

The record shows that defendant has waived this issue for review because his trial counsel failed to offer alternative verdict forms, or at least object to the forms that defendant now challenges, or include the issue in a post-sentencing motion. *Kuntu*, 196 Ill. 2d at 134-35; *Redd*, 173 Ill. 2d at 41. However, defendant invokes the doctrine of plain error. 134 Ill. 2d R. 451(c). We hold that the verdict forms under review did not omit the required elements for death eligibility under sections 9—1(b)(6) and (b)(8). Accordingly, we find no plain error. See *Williams*, 193 Ill. 2d at 364, citing *Keene*, 169 Ill. 2d at 17.

The death-eligibility verdict form for statutory aggravating factor 9—1(b)(6) stated that the jury found, *inter alia*, that "Joshua Evans was killed in the course of another felony as set forth in paragraph [4] of the Second Proposition concerning the First Degree Murder of Joshua Evans." The death-eligibility verdict form for the statutory aggravating factor 9—1(b)(8) stated that the jury found, *inter alia*, that "Joshua Evans was killed to prevent Joshua Evans from giving material assistance to the State, as set forth in paragraph [3] of the Second Proposition concerning the First Degree Murder of Joshua Evans."

Defendant argues that each verdict form is deficient because it omits the required element of defendant's

mental state for the offense. See 720 ILCS 5/9—1(b)(6), (b)(8) (West 1994). In *People v. Mack*, 167 Ill. 2d 525 (1995), this court held that where a verdict purports to set out the elements of the offense as specific findings, it must do so completely or be held insufficient. *Mack*, 167 Ill. 2d at 538. The *Mack* court concluded that the verdict form at issue was defective because it attempted to set forth a statutory aggravating factor, but did so incompletely by omitting the mental state element under section 9—1(b)(6). See *Williams*, 193 Ill. 2d at 364-65 (discussing *Mack*).

We cannot accept defendant's argument. The test of the sufficiency of a verdict is whether the intention of the jury can be ascertained with reasonable certainty from the language used. In determining the meaning of a verdict, all parts of the record will be searched and interpreted together. *People v. McNeal*, 175 Ill. 2d 335, 361 (1997), citing *People v. Mack*, 167 Ill. 2d 525, 537 (1995). Here, each verdict form expressly directed the jury to the form's corresponding instruction, of which defendant does not complain, which completely and accurately sets forth all of the elements of the statutory aggravating factor. See *Williams*, 193 Ill. 2d at 362-68. By referring to "paragraph [4] of the Second Proposition concerning the First Degree Murder of Joshua Evans," the felony-murder eligibility verdict form in defendant's case incorporated the necessary elements under section 9—1(b)(6), including the required mental state and defendant's infliction of injuries on Joshua. See *Williams*, 193 Ill. 2d at 368. The same applies to the eligibility verdict form for aggravating factor 9—1(b)(8).

We concluded in Williams' appeal:

"As a result, unlike *Mack*, a conclusion in defendant's case that the jury found the necessary elements under section 9—1(b)(6) need not be based on speculation. When we consider the verdict forms in the context of the record in defendant's case, we can conclude with reasonable certainty

that the jury found these elements. Accordingly, we hold that defendant was properly found eligible for the death penalty based on the felony-murder statutory aggravating factor premised on Joshua's murder." *Williams*, 193 Ill. 2d at 368.

This conclusion applies to defendant in this case, as to both statutory aggravating factors 9—1(b)(6) and 9—1(b)(8).

Since we find no error at all in these two death-eligibility verdict forms, additional contentions of defendant necessarily fail. First, defendant was independently eligible for the death penalty on the grounds that he killed Joshua in the course of another felony, and that he murdered Joshua to prevent him from giving material assistance to the State. Thus, the jury's reliance on any other aggravating factors did not affect its finding that defendant was eligible for the death penalty. See *Williams*, 193 Ill. 2d at 368; *Williams*, 181 Ill. 2d at 321; *People v. Coleman*, 129 Ill. 2d 321, 345-46 (1989). Second, the jury's consideration of any other aggravating factor at the penalty phase of the death sentencing hearing did not require resentencing. See *Williams*, 193 Ill. 2d at 368-73; *Williams*, 181 Ill. 2d at 321-22; *Coleman*, 129 Ill. 2d at 347. Third, defendant was not prejudiced in terms of *Strickland*. See, *e.g.*, *People v. McCallister*, 193 Ill. 2d 63, 107-08 (2000).

### Penalty Phase

### X. Failure to Present Mitigation Evidence

Defendant next claims that he did not receive effective assistance of counsel at the penalty phase of the death sentencing hearing. He contends that his trial counsel failed to investigate and present certain mitigation evidence.

The familiar *Strickland* test is composed of two prongs: deficiency and prejudice. First, the defendant must prove that counsel erred so seriously and performed

so deficiently that he or she was not functioning as the "counsel" guaranteed by the sixth amendment. A court measures counsel's performance by an objective standard of competence under prevailing professional norms. To establish deficiency, the defendant must overcome the strong presumption that the challenged action or inaction might have been the result of sound trial strategy. *People v. Evans*, 186 Ill. 2d 83, 93 (1999). Accordingly, counsel's strategic choices, made after investigating the law and the facts, are virtually unchallengeable. *People v. Richardson*, 189 Ill. 2d 401, 413 (2000).

Second, the defendant must establish prejudice. The defendant must prove that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. The prejudice prong of *Strickland* entails more than an "outcome-determinative" test. The defendant must show that counsel's deficient performance rendered the result of the trial unreliable or the proceeding fundamentally unfair. *Richardson*, 189 Ill. 2d at 411.

In this case, defendant refers to the record of Ward's trial. Ward and Wesley Rozema were incarcerated in the Du Page County jail. They met and spoke of their respective predicaments. Rozema testified that Ward made inculpatory statements. Ward specifically told Rozema that he and two "rappies" committed the crimes. According to Rozema, a "rappie" is "someone that shares the rap with you, like a codefendant." Ward identified his rappies as Williams and a friend. According to Rozema, Ward confessed that he shot Debra in the head and stabbed Samantha, and Williams cut Elijah out of Debra's stomach.

Defendant now argues that his trial counsel was constitutionally deficient for failing to present Rozema's

testimony at the penalty phase of the death sentencing hearing. According to defendant, this testimony "was significant mitigating evidence that lessened [defendant's] culpability since it showed he did not inflict any injuries on two decedents."

However, assuming that trial counsel was deficient under the first prong of *Strickland*, defendant must still show prejudice under the second prong. In the context of a death sentencing hearing, a defendant must prove that there is a reasonable probability that, absent counsel's deficient conduct, the sentencer would have concluded that the balance of aggravating and mitigating circumstances did not warrant death. *People v. Coleman*, 183 Ill. 2d 366, 403 (1998); *People v. Griffin*, 178 Ill. 2d 65, 87 (1997). A court must assess prejudice realistically based on the totality of the evidence. Accordingly, it is improper to focus solely on the potential mitigating evidence. Rather, a court must also consider the nature and extent of the evidence in aggravation. *Richardson*, 189 Ill. 2d at 416.

In this case, the State never presented evidence that defendant had personally harmed Debra or Samantha. Yet the jury nonetheless determined that defendant should receive the death penalty. Therefore, there is no reasonable probability that, had defendant's trial counsel presented Rozema's testimony, the jury would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.

XI. Limitation of Mitigation Testimony

Defendant next contends that the trial court improperly limited the direct examination of Dr. Savarese. We will consider this issue, even though defendant failed to include it in his post-trial motion, because the issue concerns a constitutional right and defendant raised the issue at trial. See *McCallister*, 193 Ill. 2d at 99-100; *Keene*, 169 Ill. 2d at 10.

To meet constitutional standards, a capital sentencing hearing must allow for individualized consideration of the offender and the offense. In conjunction with this requirement, the sentencer in a capital case may not be precluded from considering, or refuse to consider as a matter of law, any relevant mitigation evidence offered by the defense. Allowing the sentencer to consider all relevant mitigation evidence satisfies the requirement of individualized sentencing in capital cases. *People v. Hudson*, 157 Ill. 2d 401, 454 (1993).

Accordingly, the ordinary rules of evidence are relaxed at the aggravation/mitigation stage of a capital sentencing hearing. This is necessary because it is important that the sentencer possess the fullest information possible with respect to the defendant's life, character, criminal record, and the circumstances of the particular offense. *People v. Kliner*, 185 Ill. 2d 81, 171 (1998); *People v. Edgeston*, 157 Ill. 2d 201, 236 (1993). As a result, the only requirement for the admissibility of evidence at this stage of a capital sentencing hearing is that the evidence be relevant and reliable. *Edgeston*, 157 Ill. 2d at 236. This determination rests within the sound discretion of the trial court. *Hall*, 195 Ill. 2d at 20-21 (and cases cited therein); *People v. Johnson*, 146 Ill. 2d 109, 152 (1991).

After hearing an offer of proof regarding his testimony, the trial court went through Dr. Savarese's written evaluation and ruled on what subjects to which he could and could not testify. The court ruled that Dr. Savarese could not testify regarding the psychiatric hospitalizations of defendant's grandmother, Winifred, that occurred prior to defendant's birth. Dr. Savarese also was not allowed to testify regarding the schizophrenic behavior of defendant's mother unless defendant was exposed to such behavior. Finally, the court ruled that because Dr. Savarese was not a psychiatrist, he could not testify to anything that appeared to be a diagnosis.

We note that we have previously upheld similar limitations on Dr. Savarese's testimony. See *People v. Armstrong*, 183 Ill. 2d 130, 152-54 (1998). Additionally, the jury heard much of the excluded information from defendant's other mitigation witnesses, rendering the excluded testimony of Dr. Savarese merely cumulative. See *People v. Brown*, 172 Ill. 2d 1, 50-51 (1996). We cannot say that the trial court abused its discretion in making these relevancy determinations. See *Johnson*, 146 Ill. 2d at 152.

## XII. Mercy

Defendant claims that four errors occurred at the penalty phase of the death sentencing hearing that restricted the jury's consideration of mercy as a mitigating factor. Mercy is a relevant factor for consideration at a death sentencing hearing, to be considered within the context of all factors in aggravation and mitigation. *People v. Hope*, 168 Ill. 2d 1, 46-47 (1995). Defendant suggests that we should review each purported error *de novo*. However, for the reasons stated below, we reject this assertion.

### A. *Mitigation Testimony*

First, defendant contends that the trial court improperly limited the mitigation testimony of defendant's great aunt Sonia Glover. The determination of whether this evidence is relevant and reliable, and hence admissible, lies within the sound discretion of the trial court. See *People v. Kliner*, 185 Ill. 2d 81, 171 (1998); *People v. Bounds*, 171 Ill. 2d 1, 62 (1995).

Defendant's trial counsel asked Glover: "Ma'am, are you asking—are you asking the jury to consider mercy for [defendant]?" The State objected, and the trial court held a brief sidebar. The court reasoned: "How is this not an appeal for a specific sentence? This is an issue before the jury and a question for them to decide." The court sustained the objection.

We agree with the trial court. A witness' opinion that a defendant should not be sentenced to death is not admissible at a death sentencing hearing. The decision of whether to impose the death penalty rests with the sentencing authority. The testimony of aggravation or mitigation witnesses concerning the nature and circumstances of the offense and the offender is relevant to the sentencer's decision. See, *e.g.*, *People v. Howard*, 147 Ill. 2d 103, 158 (1991), adopting *Payne v. Tennessee*, 501 U.S. 808, 115 L. Ed. 2d 720, 111 S. Ct. 2597 (1991) (victim impact evidence admissible). However, the opinions of witnesses regarding what sentence should be imposed are not. *Howard*, 147 Ill. 2d at 162. "Such opinions are not evidence and therefore are irrelevant and inadmissible." *People v. Williams*, 161 Ill. 2d 1, 70 (1994). Moreover, the sustaining of this objection in no way told defendant's trial counsel that he could not argue for mercy or told the jury that it could not consider mercy. We cannot say that the trial court abused its discretion.

### B. *Jury Instruction*

Second, defendant contends that the trial court improperly refused his tendered nonpattern jury instruction regarding mercy. If the Illinois Pattern Jury Instructions, Criminal (3d ed. 1992) (hereafter IPI Criminal 3d), contain an applicable instruction on a subject about which the trial court determines the jury should be instructed, the trial court must use that instruction, unless the court determines that the instruction does not accurately state the law. 134 Ill. 2d R. 451(a). The decision whether to give a nonpattern instruction rests within the sound discretion of the trial court. A trial court does not abuse its discretion by refusing to give a nonpattern instruction if the subject matter of the refused nonpattern instruction is covered by a pattern instruction or other given instructions. *People v. Buss*, 187 Ill. 2d 144, 232-33 (1999); *People v. Gilliam*, 172 Ill. 2d 484, 519 (1996).

Defendant tendered the following nonpattern jury instruction: "Mercy is a proper non-statutory mitigating factor that the jury may consider as a reason why the defendant should not be sentenced to death." However, the jury received IPI Criminal 3d No. 7C.06, of which defendant does not complain. That pattern instruction reads in part: "Mitigating factors include: *** Any other reason supported by the evidence why the defendant should not be sentenced to death." This court has repeatedly held that mercy is one such "other reason[ ]." *People v. Sutherland*, 155 Ill. 2d 1, 29 (1992); *People v. Lear*, 143 Ill. 2d 138, 151 (1991). This pattern instruction permitted the jury to consider mercy, and, therefore, no additional specific instruction concerning this nonstatutory mitigating factor was necessary. See, *e.g.*, *Buss*, 187 Ill. 2d at 235.

Additionally, defendant was allowed to present mitigation evidence, and, as we will next discuss, defendant's trial counsel argued for mercy in his closing argument. Thus, the jury was in a position to consider mercy, or any other mitigating factor, as it saw fit. See, *e.g.*, *People v. Miller*, 173 Ill. 2d 167, 198-99 (1996). We cannot say that the trial court abused its discretion in refusing defendant's nonpattern instruction.

### C. *Closing Argument: Defense*

Third, defendant contends that the trial court restricted his trial counsel's closing argument regarding mercy. The regulation of the substance and style of closing argument lies within the trial court's discretion; the court's determination of the propriety of the remarks will not be disturbed absent a clear abuse of discretion. *People v. Byron*, 164 Ill. 2d 279, 295 (1995); *People v. Ramey*, 151 Ill. 2d 498, 554 (1992).

In his closing argument, defendant's trial counsel argued for mercy. During his remarks, the following colloquy occurred:

"If you decide in this case that you should dispense mercy, it isn't because he deserves it. It's because you have decided that's what you want to do. That's within your conscience. That's within your morality. It isn't about deserving. But mercy is blessed about two times over. It's blessed to the giver and it's blessed to the receiver.

There's a saying most of you are familiar with and that is, blessed are the merciful, for they shall have mercy. If you decide that mercy is what you are going to dispense, you should not feel badly about that. That is your individual, your conscious decision in this particular matter.

[Prosecutor]: Objection to the analysis.

THE COURT: Approach the bench please.

\* \* \*

[Prosecutor]: It's an inappropriate line of argument to ask an individual hold their own personal moral standards for what the appropriate verdict may be.

THE COURT: [Defense counsel], your response.

[Defense counsel]: I don't understand the objection.

THE COURT: My ruling is as follows, the jurors are to decide this matter based upon the facts and applying the law to the facts, what they bring into the courtroom, their experiences in life. But they're to decide this matter according to the law, and that is not according to their own individual religious or moral beliefs, superseding the law in any way when they decide this matter \*\*\*.

Also, you are not to call for the jury to impose mercy based upon the fact that they, in fact, themselves endorse some benefit, whether that be mercy upon themselves or others in this life or another life or by some means, or any kind of benefit whatsoever at any time. The jurors are not deciding this matter based upon some benefit they might receive in any kind of context whatsoever. That type of argument is not proper.

\* \* \*

[Addressing the jury] Ladies and gentlemen, you are to decide this matter based upon the facts and applying the law to the facts appropriately. No effect upon yourself is to be considered."

Defendant's trial counsel then concluded his discussion of mercy by arguing that the jury could appropriately consider mercy as a mitigating factor.

We agree with the trial court's ruling. As stated earlier, mercy must be considered in the context of all aggravating and mitigating factors. *Hope*, 168 Ill. 2d at 46-47. The trial court did not tell defendant's trial counsel that he could not argue for mercy and did not tell the jury that it could not consider mercy. Rather, the court properly explained that the jury must base its decision on the facts. This correct oral explanation accords with IPI Criminal 3d Nos. 7C.01, 7C.02, which the jury received and of which defendant does not complain. We cannot say that the trial court abused its discretion.

### D. *Closing Argument: State*

Fourth, defendant contends that the State, during its rebuttal argument, "improperly equated the defense request for mercy as a request for the jury to ignore the law and violate its oath." Defendant specifically complains of four remarks, three of which his trial counsel failed to object to at trial. Therefore, any complaint regarding these counts is waived. See *Moore*, 171 Ill. 2d at 118; *People v. Peeples*, 155 Ill. 2d 422, 495-96 (1993). Defendant invokes the plain error exception to the waiver rule. However, before considering the plain error doctrine, we determine whether any error occurred at all. *People v. Sims*, 192 Ill. 2d 592, 621 (2000); *People v. Precup*, 73 Ill. 2d 7, 17 (1978).

During the State's rebuttal argument, a prosecutor made the following remarks:

"Counsel asks you to ignore your duty and your oath that you have taken—

[Defense counsel]: Objection.

THE COURT: Argue the evidence ***.

[Prosecutor]: Do not be fooled by the psychology of asking for mercy, in referring to the defendant as being born into a situation where he was basically a piece of garbage. Keep your common sense. So you do bring that with you to this phase too, your common sense and your life experiences.

\* \* \*

The defendant asks you for mercy through his counsel. That is something he did not show to Debra, Samantha or Joshua. Mercy is a blessing that is an act of divine favor and compassion. It's a compassionate treatment of those in stress.

Mercy in a courtroom has to be earned. Do not feel guilty and do not feel guilt for refusing to afford this defendant mercy. Because by his choices, he has forgone the opportunity to receive mercy from him [*sic*] by his actions and by his conduct. Do not feel guilt for fulfilling your obligations under the law.

You as jurors took an oath to follow the law that this court gives you. You want to follow that law without being swayed by sympathy or prejudice.

The law in this defendant[']s horrific conduct and actions do [*sic*] not allow you to show him any mercy. Show this defendant the same mercy he showed Joshua Evans.

This defendant stands before you, through his counsel, and asks for the minimum sentence. There are two choices in this case. He asks you for the minimum sentence. Mercy cannot let him avoid his appropriate measure of justice in this case. The defendant, by his actions, has not earned a minimum sentence, based on mercy.

But based on the law, the defendant's conduct in the law [*sic*] requires you to return a verdict of sentencing this defendant to death.''

Prosecutors are afforded wide latitude in closing argument, and a prosecutor's comments in closing argument will result in reversible error only when they engender substantial prejudice against a defendant to the extent that it is impossible to determine whether the jury's verdict was caused by the comments or the evidence. Closing arguments must be reviewed in their entirety, and the challenged remarks must be viewed in context. *People v. Macri*, 185 Ill. 2d 1, 62 (1998) (and cases cited therein). Since mercy is a relevant mitigating factor, a prosecutor's argument suggesting that the jury could not consider mercy as a mitigating factor, or that

mercy differed from other mitigating factors, constitutes error. *Buss*, 187 Ill. 2d at 244-45.

Examining the challenged remarks in context, we determine that they do not constitute reversible error. We previously quoted from defendant's closing argument. Defendant's trial counsel essentially argued to the jury that mercy had nothing to do with mitigation evidence, and that the jury should dispense mercy with no regard to the facts of the case.

The prosecutor responded to defendant's closing argument with the challenged remarks. If the State's argument suggested that the jury could not consider mercy as a mitigating factor, it would be erroneous. See *Buss*, 187 Ill. 2d at 244-45. However, the prosecutor did not argue that mercy was not a mitigating factor, or that mercy differed from other mitigating factors. Rather, the prosecutor properly argued that the jury was to dispense mercy based on the aggravation and mitigation evidence, and that mitigation evidence was absent in this case. "During the sentencing hearing, the prosecutor may contest the significance and weight of the defendant's mitigating evidence, and is not required to agree that the evidence offered in mitigation by defendant is indeed mitigating." *Macri*, 185 Ill. 2d at 63. Indeed, the fact that defendant's trial counsel argued that the jury could appropriately consider mercy as a mitigating factor, and the fact that the State argued in rebuttal that defendant did not deserve mercy, indicated to the jury that it had the power to factor mercy into its sentencing determination. See *Buss*, 187 Ill. 2d at 245. Because we find that the challenged prosecutorial remarks do not constitute reversible error, we also find no plain error. See *Keene*, 169 Ill. 2d at 17 (all plain errors are reversible errors).

We note that even if these prosecutorial remarks are viewed as erroneous, we cannot say that they constituted plain error. The jury was instructed that mitigating fac-

tors are "[a]ny reason supported by the evidence why the defendant should not be sentenced to death" and that "any statement or argument made by the attorneys which is not based on the evidence should be disregarded." See *Hope*, 168 Ill. 2d at 26-27. In the context of the parties' arguments as a whole and these instructions, we find that the State's remarks did not deny defendant a fair sentencing hearing. See *Buss*, 187 Ill. 2d at 245.

Defendant alternatively asserts that he was denied the effective assistance of counsel when his trial counsel failed to object to most of the challenged remarks. We disagree. We have concluded that the challenged remarks did not constitute reversible error. The trial court would have rightfully overruled any defense objection thereto. Consequently, had defense counsel objected, the result would have been no different from the effect of his failure to object. Thus, defendant was not prejudiced in terms of *Strickland*. See, *e.g.*, *Kuntu*, 196 Ill. 2d at 129-30; *Shaw*, 186 Ill. 2d at 332.

### Additional Contentions

### XIII. Disparate Sentences

Following separate trials, Williams was sentenced to death, and Ward was sentenced to a prison term of natural life. Defendant contends that his sentence was unreasonably disparate to the sentence of Ward.

Comparative proportionality review in death penalty cases is not required by the United States Constitution and is not a feature of the Illinois death penalty statute. Nonetheless, this court has the constitutional duty to determine whether a death sentence has been imposed arbitrarily or capriciously, or is unduly severe, considering the circumstances of the offense and the character and rehabilitative prospects of the defendant. To guarantee the individualized sentencing that the eighth amendment requires, this court has compared a defendant's

death sentence to the sentence of a codefendant or an accomplice. This court has focused on the nature of the offense, each individual's relative involvement, his character and background, and his criminal record and potential for rehabilitation. *People v. Easley*, 192 Ill. 2d 307, 345 (2000); *People v. Bean*, 137 Ill. 2d 65, 133-35 (1990).

In this case, defendant argues that Ward is at least as culpable as defendant, if not more so. Defendant points to Rozema's testimony at Ward's trial. According to Rozema, Ward confessed that he shot Debra in the head and stabbed Samantha, and Williams cut Elijah out of Debra's stomach. In contrast, at defendant's trial, the State presented no evidence that defendant inflicted any injuries upon Debra or Samantha. According to defendant, Ward is more culpable because he killed two of the three victims. Also, defendant notes that Ward generally had a significant criminal record.

We cannot accept this contention. We view defendant's participation in these crimes as not significantly less than that of Ward. As the State notes, defendant participated in a planned killing and a kidnapping that resulted in the murder of a pregnant mother and her two children. Defendant personally killed Joshua and helped dump the child in an alley to die.

Although Ward's criminal record may be quantitatively more severe than defendant's, that is only one factor in our evaluation. See *People v. Towns*, 174 Ill. 2d 453, 480 (1996). Further, that defendant and Williams each received a death sentence "persuades us that defendant's sentence was neither arbitrary nor capricious." *Byron*, 164 Ill. 2d at 303. We conclude that defendant's death sentence was not unreasonably disparate to Ward's natural life prison sentence.

XIV. Constitutionality of Death Penalty Statute

Defendant lastly contends that the Illinois death penalty statute is unconstitutional. U.S. Const., amends.

VIII, XIV; Ill. Const. 1970, art. I, §§ 2, 11. Defendant argues that current procedural safeguards are inadequate to minimize the risk that the death penalty will be applied to innocent persons, and because it is inevitable that innocent people will be executed. This court has repeatedly rejected these arguments. *Kirchner*, 194 Ill. 2d at 558-59; *People v. Hall*, 194 Ill. 2d 305, 357-58 (2000); *People v. Bull*, 185 Ill. 2d 179, 211-20 (1998). Defendant has not persuaded us to overturn these decisions.

We note the Chief Justice's belief that this court has inflicted harm on the "integrity of the criminal justice system" by refusing "to acknowledge deficiencies so egregious that a Republican governor was forced to step in and suspend the implementation of every sentence of death we approved." 205 Ill. 2d at 137-38 (Harrison, C.J., dissenting). Once again, the Chief Justice has impugned the integrity of this court. See, *e.g., People v. Simpson*, 204 Ill. 2d 536, 579 (2001) (Harrison, C.J., dissenting) (accusing this court of having "found ways" to uphold convictions in capital cases); *People v. Simms*, 192 Ill. 2d 348, 432 (2000) (Harrison, C.J., dissenting) (stating that "our court no longer felt any compunction about illegally dismissing a death row inmate's appeal and having him summarily put to death"); *Bull*, 185 Ill. 2d at 221-22 (Miller, J., specially concurring) (collecting statements).

The Chief Justice's statement regarding the Governor's motives for imposing the moratorium lacks factual support. The Governor has in no way publicly stated that the moratorium was based on any action or omission of this court. Press Release, *Governor Ryan Declares Moratorium on Executions, Will Appoint Commission to Review Capital Punishment System* (George H. Ryan, Governor) Jan. 31, 2001.

Further, the Chief Justice's statement also lacks legal support. In *People v. Hickey*, 204 Ill. 2d 585, 624 (2001),

this court recently acknowledged the Governor's moratorium on future executions:

> "While we certainly are aware of those cases in which a defendant had been convicted and sentenced to death, but later was exonerated and released from prison, we do not infer from these cases that the entire system has collapsed. The Governor declared a moratorium on future executions after several death row defendants were exonerated. We do not infer from the moratorium, however, that every capital trial has been unreliable and that all appellate review has been haphazard."

Once again, we must remind the Chief Justice that honorable people disagree over whether this state should have a death penalty. His deeply held view against the death penalty does not give him license to misstate the facts so as to impugn the integrity of this court. See *People v. Simpson*, 204 Ill. 2d at 579 (Freeman, J., specially concurring, joined by McMorrow, J.).

## CONCLUSION

For the foregoing reasons, the judgment of the circuit court of Du Page County is affirmed. The clerk of this court is directed to enter an order setting Thursday, January 24, 2002, as the date on which the sentence of death entered in the circuit court is to be imposed. The defendant shall be executed in the manner provided by law. 725 ILCS 5/119—5 (West 1998). The clerk of his court shall send a certified copy of the mandate in this case to the Director of Corrections, the warden of Tamms Correctional Center, and the warden of the institution where defendant is now confined.

*Affirmed.*

CHIEF JUSTICE HARRISON, dissenting:

This matter is before us on Caffey's direct appeal from his convictions and sentence of death. During the pendency of Caffey's appeal, our court adopted a comprehensive set of new rules governing the conduct of all

cases in which the State is seeking the death penalty. With certain exceptions, the new rules took effect March 1, 2001, and apply to all cases pending on direct review, including cases commenced before the rules were enacted. *People v. Hickey*, 204 Ill. 2d 585, 631-36 (2001) (Harrison, C.J., dissenting); see also *People ex rel. Birkett v. Bakalis*, 196 Ill. 2d 510, 513 (2001).

Although the new rules are procedural in nature, the innovations they introduce are not mere technicalities. They are indispensable safeguards for achieving an accurate determination of innocence or guilt. Whether they will eliminate all of the constitutional defects in the present death penalty law we cannot yet say. That must await the test of time and experience. What we can say now is that any conviction and sentence obtained without the aid of the new rules cannot be deemed reliable and must be set aside. *Hickey*, 204 Ill. 2d at 634 (Harrison, C.J., dissenting).

Presently, some 160 defendants face death sentences in this state. The task of retrying those defendants will be formidable, but it is no more formidable than dealing with the direct appeals and post-conviction challenges involving the existing convictions and sentences. Addressing the problems which have permeated those convictions and sentences has imposed heavy burdens on the courts. The morass of litigation attendant to the present system of capital punishment has become a significant drain on the resources of this court, the circuit courts, the attorney general, the public defenders and the local State's Attorneys.

The costs go beyond budgets and manpower. The dearest cost, in fact, may have nothing to do with human or financial resources. It may be in the harm inflicted on integrity of the criminal justice system by the court's refusal to acknowledge deficiencies so egregious that a Republican governor was forced to step in and suspend

the implementation of every sentence of death we approved.

Protestations by this court that the judiciary is working as it should are pointless. If we truly believed our system of capital punishment was working as it should, we would not have empowered a committee to consider new rules for death cases and we would not have adopted the comprehensive new rules that committee proposed.

The rules we have adopted represent as fundamental a change in criminal procedure as any in recent Illinois history. Having possessed the courage and foresight to adopt those rules, we must not now shrink from our duty to put them into effect. Accordingly, because Caffey was tried, convicted and sentenced without the benefit of the new rules, his convictions and death sentence should be vacated, and the cause should be remanded to the circuit court for a new trial.

Even if Caffey were not entitled to a new trial in accordance with the new rules, his sentence of death could not stand. For the reasons set forth in my partial concurrence and partial dissent in *People v. Bull*, 185 Ill. 2d 179 (1998), the Illinois death penalty law is void and unenforceable because it violates the eighth and fourteenth amendments to the United States Constitution (U.S. Const., amends. VIII, XIV) and article I, section 2, of the Illinois Constitution (Ill. Const. 1970, art. I, § 2). Absent the new rules, there is no basis for altering that conclusion. At a minimum, Caffey's sentence of death should therefore be vacated, and he should be sentenced to a term of imprisonment. 720 ILCS 5/9—1(j) (West 1994). Because he was convicted of murdering more than one victim, the term of imprisonment must be natural life. 730 ILCS 5/5—8—1(a)(1)(c)(ii) (West 1994).

JUSTICE KILBRIDE, also dissenting:

For the reasons set forth in my dissents in *People v. Hickey*, 204 Ill. 2d 585, 636-40 (2001) (Kilbride, J., dis-

senting), and *People v. Simpson*, 204 Ill. 2d 536, 581-85 (2001) (Kilbride, J., dissenting), I agree with Chief Justice Harrison that defendant's convictions and sentence should be set aside because the trial proceedings were not conducted in accordance with the new supreme court rules governing capital cases. The procedures in capital cases prior to this court's adoption of the new rules were inherently unreliable and did not adequately protect a defendant's constitutional rights. Consequently, since the new rules were promulgated to address the deficiencies of constitutional dimension that regularly occurred under the old system, the rules must be applied retroactively to all capital cases currently pending on direct appeal. See *People v. Hudson*, 195 Ill. 2d 117, 126 (2001), citing *Griffith v. Kentucky*, 479 U.S. 314, 328, 93 L. Ed. 2d 649, 661, 107 S. Ct. 708, 716 (1987). For those reasons, I respectfully dissent.